# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 51254-8-II |
| Respondent, | |
| v. | PUBLISHED OPINION |
| JAMES WRENNE ANDREW GORMAN-LYKKEN, | |
| Appellant. | |

MAXA, C.J. – James Gorman-Lykken appeals his conviction of second degree rape. He argues that the trial court erred in overruling his objection to having a corrections officer stationed next to the witness stand while he testified.

We agree that the trial court abused its discretion in allowing the corrections officer to be stationed next to the testifying defendant without analyzing whether case-specific reasons supported the need for that security measure. Accordingly, we reverse Gorman-Lykken's conviction and remand for further proceedings.[1]

## FACTS

The State charged Gorman-Lykken with one count of second degree rape – domestic violence. As charged, the State was required to prove that Gorman-Lykken engaged in sexual intercourse with his girlfriend when she was incapable of consent. RCW 9A.44.050.

---

[1] Gorman-Lykken also argues that (1) the trial court erred in denying his motion for a continuance, (2) an admitted error in the to-convict instruction requires reversal, (3) the prosecutor engaged in misconduct, (4) cumulative error deprived him of a fair trial, and (5) the criminal filing fee imposed on him at sentencing should be stricken. Because we reverse on other grounds, we do not address these arguments.

At trial, Gorman-Lykken elected to testify. Before Gorman-Lykken testified, defense counsel objected to the proximity of the corrections officer assigned to Gorman-Lykken while he was on the witness stand. Defense counsel suggested that this procedure was the "usual protocol." 4 Report of Proceedings (RP) at 341. The trial court responded, "Let me just touch base with the corrections officer." 4 RP at 341. The officer stated that "If he's up here, we're up here." 4 RP at 342.

The trial court then observed that sometimes one to three corrections officers were assigned to a defendant in court and that "[s]ometimes those individuals are large, larger than average." 4 RP at 342. By contrast, the court noted that the corrections officer assigned to Gorman-Lykken was "not one of [our] largest corrections officers, and there's only one of her." 4 RP at 342. The court also stated that "the policy [of] the corrections staff is that . . . they are to be in close proximity to somebody who is testifying that's been accused of a crime." 4 RP at 342.

The trial court's only other discussion of the objection was as follows:

> I don't think it's any surprise to the jurors that with the corrections officer what she's doing here, they've seen her throughout the trial. So with his repositioning . . . to the witness stand - - I'm sensitive to the concern of - - the concern is I think that, well, we have to have this officer nearby because this person is dangerous, this person is going to run.
>
> I mean, the jury could think many different things, and I think that's the concern that [defense counsel] in part is expressing by bringing the motion to change the position of the corrections officer.

4 RP at 342-43. The court concluded, "I think on the whole I'm comfortable having the officer stay where she's at." 4 RP at 343.

The jury found Gorman-Lykken guilty of second degree rape. Gorman-Lykken appeals his conviction.

ANALYSIS

Gorman-Lykken argues that the trial court erred in allowing the corrections officer to be stationed next to the witness stand during his testimony as a security measure. We agree.

A.    STANDARD OF REVIEW

The trial court has broad discretion to make trial management decisions, including "provisions for the order and security of the courtroom." *State v. Dye*, 178 Wn.2d 541, 547-48, 309 P.3d 1192 (2013). Therefore, we review for an abuse of discretion a trial court's ruling regarding security measures. *Id.* at 548; *see also State v. Jaime*, 168 Wn.2d 857, 865, 233 P.3d 554 (2010). And the abuse of discretion standard applies even if the challenged courtroom procedure allegedly is prejudicial. *Dye*, 178 Wn.2d at 548.

However, the trial court is required to actually exercise discretion in determining whether a security measure is necessary. *State v. Damon*, 144 Wn.2d 686, 692, 25 P.3d 418 (2001). Therefore, an abuse of discretion exists if the trial court relies solely on the concerns of a corrections officer in approving a security measure. *Id.*

> Courts have specifically found reversible error where the trial court based its decision solely on the judgment of correctional officers who believed that using restraints during trial was necessary to maintain security, while no other justifiable basis existed on the record.

*State v. Finch*, 137 Wn.2d 792, 853, 975 P.2d 967 (1999).

B.    LEGAL PRINCIPLES – COURTROOM SECURITY MEASURES

The presumption of innocence is a basic component of a fair trial under our criminal justice system. *Jaime*, 168 Wn.2d at 861. To preserve the presumption of innocence, the defendant is " 'entitled to the physical indicia of innocence which includes the right of the defendant to be brought before the court with the appearance, dignity, and self-respect of a free and innocent [person].' " *Id.* at 861-62 (quoting *Finch*, 137 Wn.2d at 844). Courtroom security

measures that single out defendants as particularly dangerous or guilty threaten their right to a fair trial because those measures erode the presumption of innocence. *Jaime*, 168 Wn.2d at 862.

Courts have recognized that certain courtroom security measures are inherently prejudicial. *Finch*, 137 Wn.2d at 845-46 (shackling, handcuffing, or other physical restraints; gagging the defendant); *Jaime*, 168 Wn.2d at 864 (holding a trial in a jail). Courts must closely scrutinize such measures to ensure that they further essential state interests. *Id.* at 865.

Before allowing an inherently prejudicial security measure, the trial court must make a factual determination that the measure is " 'necessary to prevent injury to those in the courtroom, to prevent disorderly conduct at trial, or to prevent an escape.' " *Finch*, 137 Wn.2d at 846 (quoting *State v. Hartzog*, 96 Wn.2d 383, 398, 635 P.2d 694 (1981)). This determination must be based on specific facts in the record that relate to the particular defendant. *Jaime*, 168 Wn.2d at 866. And inherently prejudicial security measures should be allowed only in "extraordinary circumstances." *Finch*, 137 Wn.2d at 842. As a result, the court must consider less restrictive alternatives. *Id.* at 850.

However, these rules apply only to security measures that are inherently prejudicial. No Washington case has imposed a requirement that the trial court make specific findings of necessity of the type mandated in *Jaime*, *Finch*, and *Hartzog* when a security measure is not inherently prejudicial.

The routine use of security personnel in a courtroom during trial generally is not an inherently prejudicial practice. *Holbrook v. Flynn*, 475 U.S. 560, 568-69, 106 S. Ct. 1340, 89 L. Ed. 2d 525 (1986). In *Holbrook*, the United States Supreme Court "counsel[ed] against a presumption that any use of identifiable security guards in the courtroom is inherently prejudicial." *Id.* at 569. The Court noted that "the presence of guards at a defendant's trial need

4

not be interpreted as a sign that he is particularly dangerous or culpable." *Id.* "Our society has become inured to the presence of armed guards in most public places; they are doubtless taken for granted so long as their numbers or weaponry do not suggest particular official concern or alarm." *Id.*; *see also Jaime*, 168 Wn.2d at 863 (quoting *Holbrook*, 475 U.S. at 569). As a result, the Court held that the presence of four officers sitting in the front row of the spectator section during trial was not inherently prejudicial. *Holbrook*, 475 U.S. at 570-72.

The Court acknowledged that under certain conditions, the presence of security officers in the courtroom might convey the impression that the defendant is dangerous or untrustworthy. *Id.* at 569. But the Court concluded, "In view of the variety of ways in which such guards can be deployed, we believe that a case-by-case approach is more appropriate." *Id.*; *see also State v. Butler*, 198 Wn. App. 484, 494, 394 P.3d 424, *review denied*, 189 Wn.2d 1004 (2017) (quoting *Holbrook*, 475 U.S. at 569).

C.    STATIONING A SECURITY OFFICER NEXT TO A TESTIFYING DEFENDANT

The question here is whether the trial court erred in allowing the corrections officer to be stationed next to the witness stand during Gorman-Lykken's testimony. We hold that the trial court abused its discretion by failing to analyze whether any case-specific reasons other than the officer's preference supported the need for the security measure.

1.    Not Inherently Prejudicial

Initially, we must determine whether stationing the corrections officer next to the witness stand during Gorman-Lykken's testimony was inherently prejudicial. *See Jaime*, 168 Wn.2d at 862. The test is whether the security measure presented an unacceptable risk of impermissible factors coming into play. *Id.* This test requires consideration of the " 'range of inferences that a juror might reasonably draw' " from the measure. *Id.* (quoting *Holbrook*, 475 U.S. at 569). Our

consideration is based on " 'reason, principle, and common human experience.' " *Butler*, 198 Wn. App. at 493 (quoting *Estelle v. Williams*, 425 U.S. 501, 504, 96 S. Ct. 1691, 48 L. Ed. 2d 126 (1976)).

No published Washington case has considered whether stationing a corrections officer next to the witness stand is inherently prejudicial. In *Butler*, the court held that the presence of a second jail officer during the victim's testimony was not inherently prejudicial, and instead was innocuous. 198 Wn. App. at 494. But that case is not helpful because it involved a different factual scenario. Therefore, we turn to cases from other jurisdictions.

The California Supreme Court held that an officer's "presence at the witness stand during a defendant's testimony is not inherently prejudicial," reasoning under *Holbrook* that "jurors have become accustomed to seeing security officers in public places such as the courtroom . . . and there is a wide range of inferences they may draw from an officer's presence near a testifying defendant." *People v. Stevens*, 47 Cal. 4th 625, 638, 218 P.3d 272 (2009) (citing *Holbrook,* 475 U.S. at 569). In *Stevens*, the court rejected the contention that this practice impermissibly singled out the defendant: "Although [an officer's] presence next to a testifying defendant may be viewed as a defendant-focused practice when officers do not accompany other witnesses to the stand, the Supreme Court has made it clear that not 'every practice tending to single out the accused from everyone else in the courtroom must be struck down.' " *Id.* (quoting *Holbrook,* 475 U.S. at 567). The court concluded, "That a security practice seems to focus attention on the defendant is not enough, without more, to render the practice inherently prejudicial." *Id.* at 638.

Courts in other jurisdictions also have held that the practice of an officer accompanying a defendant to the witness stand was not inherently prejudicial. *See People v. Peeples*, 205 Ill. 2d

480, 500, 530, 793 N.E.2d 641 (2002) (holding the fact that a sheriff's deputy escorted the defendant to and from the witness stand and remained standing behind him during his testimony was not inherently prejudicial); *see also Wainwright v. Lockhart*, 80 F.3d 1226, 1232 (8th Cir. 1996) (it was not inherently or actually prejudicial for a defendant in a capital case to be escorted and guarded by two officers at the witness stand during the penalty phase of trial); *United States v. Williams*, 897 F.2d 1430, 1434 (8th Cir. 1990) (defendant was not prejudiced by presence of a uniformed United States Marshal standing next to him at the witness stand).

Here, the officer had been present throughout trial. There was only one officer, and she did not do anything to draw attention to herself. Gorman-Lykken and the officer moved to and from the witness box outside the presence of the jury. Therefore, we conclude that the officer's presence next to the witness stand while Gorman-Lykken testified was not *inherently* prejudicial.

2. Requirements for Not Inherently Prejudicial Security Measures

Finding that the security measure employed here was not inherently prejudicial does not end our inquiry. Washington courts have emphasized that the trial court must actually exercise discretion based on the facts of the case in considering whether to allow a courtroom security measure. *Damon*, 144 Wn.2d at 692; *Finch*, 137 Wn.2d at 846; *Hartzog*, 96 Wn.2d at 400. And as noted above, simply deferring to the judgment of a corrections officer does not constitute the exercise of discretion. *See Damon*, 144 Wn.2d at 692; *Finch*, 137 Wn.2d at 853.

No Washington case has discussed in detail the requirements of a trial court's analysis when considering a courtroom security measure that is not inherently prejudicial. For routine security measures such as the presence of officers in the courtroom, no specific inquiry on the record is required for the trial court's exercise of discretion. *See Holbrook*, 475 U.S. at 566-67, 572 (rejecting the Court of Appeals' requirement that the trial court expressly consider whether

the particular circumstances of the case supported the presence of multiple officers in the courtroom); *Butler*, 198 Wn. App. at 494 (not requiring a case-specific analysis for the "innocuous" presence of a second officer during the victim's testimony).

However, we recognize that the potential for prejudice is greater when a security officer is stationed next to a testifying defendant than when an officer or officers merely are present elsewhere in the courtroom. The court in *Holbrook* even noted that jurors may not infer anything negative about the presence of security officers "[i]f they are placed at some distance from the accused." *Holbrook*, 475 U.S. at 569. Because this security measure is not inherently prejudicial, the court need not make the detailed findings required for inherently prejudicial measures. But given this greater potential for prejudice, the trial court must undertake at least *some* analysis in this scenario.

We again refer to California cases for guidance. In *Stevens*, the court concluded that stationing an officer next to a testifying defendant was not inherently prejudicial but still required that the trial court consider case-specific reasons for allowing the security measure. 47 Cal. 4th at 638, 642.

> The court may not defer decisionmaking authority to law enforcement officers, but must exercise its own discretion to determine whether a given security measure is appropriate on a case-by-case basis. . . .
>
> The trial court should state its reasons for stationing a guard at or near the witness stand and explain on the record why the need for this security measure outweighs potential prejudice to the testifying defendant.

*Id.* at 642.

In *People v. Hernandez*, the California Supreme Court subsequently held based on *Stevens* that the trial court abused its discretion where the trial judge "stationed the deputy at the witness

8

stand as a routine practice, and not based on case-specific considerations." 51 Cal. 4th 733, 744, 247 P.3d 167 (2011). The court stated,

> [T]he record demonstrates that the trial court's decision to station a deputy at the witness stand during defendant's testimony was not based on a thoughtful, case-specific consideration of the need for heightened security, or of the potential prejudice that might result. . . . Despite a pointed request from defense counsel, the court refused to make an individualized finding that defendant's behavior warranted this heightened security measure.

*Id.* at 743. Further, the trial court's remarks showed that the court "was following a general policy of stationing a courtroom officer at the witness stand during *any* criminal defendant's testimony, regardless of specific facts about the defendant or the nature of the alleged crime." *Id.*

We adopt the California approach. Before allowing a security officer to be stationed next to the witness stand when the defendant testifies, the trial court must (1) state case-specific reasons for the need for such a security measure, (2) determine that the need for the security measure outweighs the potential prejudice to the testifying defendant. *Stevens*, 47 Cal. 4th at 642. And as required under Washington law, the trial court cannot rely solely on the security officer's preference. *See Damon*, 144 Wn.2d at 692.

This approach is consistent with our Supreme Court's discussion in *Dye* regarding a different courtroom management issue – a witness's use of a support animal while testifying. *See* 178 Wn.2d at 553. The court stated, "[W]e will not overrule the trial court's exercise of discretion unless the record fails to reveal the party's reasons for needing a support animal or if the record indicates that the trial court failed to consider those reasons." *Id.*

This approach also is consistent with *Holbrook*, where the Court stated that a case-by-case approach was appropriate for issues regarding the deployment of guards. 475 U.S. at 569.

3. Failure to Exercise Discretion

Here, the trial court did not identify any case-specific reason for allowing the corrections officer to be stationed next to the witness stand when Gorman-Lykken testified. The court identified the potential prejudice, stating that the officer's presence would suggest that Gorman-Lykken was dangerous and was going to run. And the court noted that there was only one officer and that she was not very large. But the court never stated case-specific reasons *why* this case or this defendant created the need for this security measure. The court simply stated, "I'm comfortable having the officer stay where she's at." 4 RP at 343.

The only reason that appears in the record for having the corrections officer stationed by the witness stand was the officer's own preference and defense counsel's reference to the "usual protocol." 4 RP at 341-42. Therefore, the record supports the conclusion that the trial court simply deferred its decisionmaking authority and discretion to the corrections officer.

Accordingly, we hold that the trial court abused its discretion in allowing the corrections officer to be stationed next to the witness stand when Gorman-Lykken testified.

4. Harmless Error

A claim that a security measure is unconstitutional is subject to a harmless error analysis. *State v. Clark*, 143 Wn.2d 731, 775, 24 P.3d 1006 (2001). The test is whether the error was harmless beyond a reasonable doubt or whether the evidence of guilt is so overwhelming that a jury could reach no rational conclusion other than guilt. *Id.* at 775-76. The question is whether the security measure "had a substantial or injurious effect or influence" on the verdict. *State v. Hutchinson*, 135 Wn.2d 863, 888, 959 P.2d 1061 (1998).

Here, the State does not argue that any error was harmless. And there is no indication that the State could show harmlessness beyond a reasonable doubt. Even though stationing an

officer next to the witness stand may not be inherently prejudicial, allowing that measure created a risk that the jury might infer that Gorman-Lykken was dangerous or guilty. The State cannot show beyond a reasonable doubt that stationing the officer next to the witness stand did not influence the jury.

Further, the evidence of Gorman-Lykken's guilt was not so overwhelming that a guilty verdict was the only rational result. At trial, Gorman-Lykken's girlfriend testified that she had taken medication that essentially put her to sleep and that she had told Gorman-Lykken not to have sex with her while she was asleep. But Gorman-Lykken testified that he asked his girlfriend if she was up for sex, that she verbally agreed, and that she was coherent during the sexual activity. Therefore, the jury was presented with conflicting evidence, not evidence that overwhelmingly established Gorman-Lykken's guilt.

We hold that the trial court's error in allowing an officer to be stationed next to the witness stand when Gorman-Lykken testified was not harmless.

CONCLUSION

We reverse Gorman-Lykken's conviction and remand for further proceedings.

_____
MAXA, C.J.

I concur:

_____
SUTTON, J.

11

MELNICK, J. (concurrence) — The State alleged James Gorman-Lykken sexually assaulted his girlfriend of five years, NK, while she slept. A jury found Gorman-Lykken guilty of rape in the second degree—domestic violence.

I concur with the majority that the court committed error by allowing a corrections officer to station herself next to the defendant while he testified. The court did not make an individualized determination of necessity. Whether or not this error alone requires reversal, I agree with Gorman-Lykken that cumulative error requires the reversal of his conviction. Additional errors included an inaccurate "to convict" jury instruction, as well as several improper statements by the prosecutor in closing arguments. I would reverse Gorman-Lykken's conviction without deciding whether the placement of the corrections officer alone requires reversal.

I.      CUMULATIVE ERROR

Under the cumulative error doctrine, the defendant must show that the combined effect of multiple errors requires a new trial. *State v. Clark*, 187 Wn.2d 641, 649, 389 P.3d 462 (2017). Cumulative error may warrant reversal, even if each error standing alone would otherwise be considered harmless. *State v. Greiff*, 141 Wn.2d 910, 929, 10 P.3d 390 (2000); *State v. Weber*, 159 Wn.2d 252, 279, 149 P.3d 646 (2006). A "defendant may be entitled to a new trial when cumulative errors produce a trial that is fundamentally unfair." *State v. Emery*, 174 Wn.2d 741, 766, 278 P.3d 653 (2012).

Although the majority concludes that the court's error in allowing a corrections officer to be stationed next to the defendant alone requires reversal, I believe that error is but one of numerous errors whose cumulative effect produced a fundamentally unfair trial. In addition to the error the majority relies on for reversal, other errors raised by Gorman-Lykken include a flawed

"to convict" instruction and several instances of improper statements by the prosecutor in closing arguments.

II.     JURY INSTRUCTIONS

Gorman-Lykken argues that the "to convict" instruction violated his due process rights under the Fourteenth Amendment of the United States Constitution and article I, section 22 of the Washington Constitution.  He argues that the instruction relieved the State of its burden to prove *all* the elements of second degree rape beyond a reasonable doubt, and instead allowed the jury to convict him if the prosecutor proved *either* of the elements.  I agree.

"[A] 'to convict' instruction must contain all of the elements of the crime because it serves as a 'yardstick' by which the jury measures the evidence to determine guilt or innocence." *State v. Smith*, 131 Wn.2d 258, 263, 930 P.2d 917 (1997).  A jury instruction is erroneous if it relieves the State of its burden to prove every element of a crime.  *State v. DeRyke*, 149 Wn.2d 906, 911-12, 73 P.3d 1000 (2003).  Reversal is required when an "omission or misstatement in a jury instruction relieves the State of its burden" of proving every essential element of the crime.  *State v. Brown*, 147 Wn.2d 330, 339, 58 P.3d 889 (2002).  A reviewing court may not rely on other instructions to supply an element missing from the 'to convict' instruction.  *DeRyke*, 149 Wn.2d at 910; *State v. Nelson*, 191 Wn.2d 61, 74, 419 P.3d 410 (2018).

At trial, the court instructed the jury on the elements of the crime.  Neither party objected to or took exception to the court's "to convict" instruction which stated,

> To convict the defendant of the crime of Rape in the Second Degree, each of the following elements of the crime must be proved beyond a reasonable doubt:
>     (1)  That on or about July 5, 2017, the defendant engaged in sexual intercourse with [NK];
>     (2)  That the sexual intercourse occurred when [NK] was incapable of consent by reason of being physically helpless or mentally incapacitated; *and*;
>     (3)  That the acts occurred in the State of Washington.

> If you find from the evidence that *either* (1), (2), and (3), has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.
>
> On the other hand, if, after weighing all of the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

Clerk's Papers (CP) at 29 (emphasis added).

This instruction contained a clear error. It stated that if the jury found "that *either* [elements] (1), (2), and (3), has been proved beyond a reasonable doubt," the jury should return a guilty verdict. CP at 29 (emphasis added). It should have stated that in order to return a guilty verdict, the jury had to find all three elements beyond a reasonable doubt.

This instruction relieved the State of its burden to prove every element of the crime beyond a reasonable doubt. Although it listed all of the elements of the crime, it did not require the jury to find all of the elements to return a guilty verdict. This error, together with the other errors discussed by the majority and below, demonstrate that Gorman-Lykken did not receive a fair trial.

III.     IMPROPER PROSECUTORIAL ARGUMENT

Gorman-Lykken argues that prosecutorial misconduct deprived him of a fair trial because the prosecutor's closing argument and rebuttal improperly impugned defense counsel, misstated the defense theory, and misstated the law.[2]

To prevail on a claim of prosecutorial misconduct, a defendant must show that the prosecutor's conduct was both improper and prejudicial. *In re Pers. Restraint of Glasmann*, 175

---

[2] Gorman-Lykken also argues that the prosecutor improperly expressed a personal opinion that Gorman-Lykken lied during his testimony and improperly commented that the victim was "on trial." Br. of Appellant at 40. I do not suggest a resolution on these issues because the other improper arguments made by the prosecutor, along with the other errors in this case, amount to cumulative error necessitating reversal. *Cf. State v. Copeland*, 130 Wn.2d 244, 922 P.2d 1304 (1996) *with State v. Reed*, 102 Wn.2d 140, 684 P.2d 699 (1984).

Wn.2d 696, 704, 286 P.3d 673 (2012).[3] In assessing whether a prosecutor's closing argument was improper, this court recognizes that the prosecutor has "wide latitude to argue reasonable inferences from the evidence, including evidence respecting the credibility of witnesses." *State v. Thorgerson*, 172 Wn.2d 438, 448, 258 P.3d 43 (2011). Where the "cumulative effect of repetitive prejudicial prosecutorial misconduct" is "so flagrant that no instruction or series of instructions can erase their combined prejudicial effect," we must reverse. *State v. Walker*, 164 Wn. App. 724, 737, 265 P.3d 191 (2011).

It is improper for a prosecutor to impugn opposing counsel's role or integrity. *State v. Lindsay*, 180 Wn.2d 423, 431-32, 326 P.3d 125 (2014). Prosecutorial statements that malign defense counsel are impermissible because they can damage a defendant's opportunity to present his or her case. *Lindsay*, 180 Wn.2d at 432. But comments that "can fairly be said to focus on the evidence" do not constitute misconduct. *Thorgerson*, 172 Wn.2d at 451.

In addition, improper remarks made in rebuttal are not reversible error "'if they were invited or provoked by defense counsel and are in reply to his or her acts and statements.'" *State v. Thierry*, 190 Wn. App. 680, 690, 360 P.3d 940 (2015) (quoting *State v. Russell*, 125 Wn.2d 24, 86, 882 P.2d 747 (1994)).

---

[3] Because I suggest reversal based on cumulative error, I need only decide that the prosecutor's argument was improper. Because Gorman-Lykken did not object to the prosecutor's comments, the normal test would be to determine if the argument was "so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." *Emery*, 174 Wn.2d 760-61. The defendant would then have to show that no curative instruction would have eliminated the prejudicial effect, and the misconduct resulted in prejudice that had a substantial likelihood of affecting the verdict. *Emery*, 174 Wn.2d at 761. However, "the cumulative effect of repetitive prejudicial prosecutorial misconduct may be so flagrant that no instruction or series of instructions can erase their combined prejudicial effect." *State v. Walker*, 164 Wn. App. 724, 737, 265 P.3d 191 (2011). Accordingly, rather than consider whether each improper comment was flagrant or ill-intentioned, I consider the cumulative effect of all the prosecutor's improper statements together, along with the other errors.

A.      Impugning Defense Counsel

Gorman-Lykken contends the prosecutor improperly argued the defense attorney lied in closing arguments.

Defense counsel stated during closing argument that

Obviously, he's [NK's] brother, and so there is that relationship between them that siblings all have.  They're going to stick up for one another.  [Her brother] never came forward to law enforcement, whether police officers or anyone on the prosecution team until the day before trial.  That's significant.  If he had something to say in this regard, wouldn't it make sense that he would have reached out to law enforcement including the prosecution team sooner than the day before trial?

Report of Proceedings (RP) (Sept. 15, 2017) at 427-28.

The prosecutor then stated during rebuttal:

[D]efense counsel makes this inaccurate statement that the day before trial [NK's brother] was contacted or came forward.  It's not true.   [He] was contacted and came forward much earlier than the day before yesterday.  That's an inaccuracy.  That's plain false.  That came out in testimony.  It's plain false.  It's as false as the accusations or testimony that the defendant gave.[4]

RP (Sept. 15, 2017) at 440.

A prosecutor is entitled to fairly respond to defense's counsel's arguments and criticisms of the State's case.  *Thorgerson*, 172 Wn.2d at 450.  But the prosecutor was incorrect that defense counsel's statement about when the brother came forward was false.  NK's brother testified on cross-examination that the first time he had spoken to law enforcement or the prosecution was "[j]ust recently."  RP (Sept. 14, 2017) at 238.  On re-cross-examination, he affirmatively stated that the first time he had "mentioned anything about this [case] to anyone connected with law enforcement was two days ago."  RP (Sept. 15, 2017) at 386.  The prosecutor improperly argued that Gorman-Lykken's lawyer made a false statement.

---

[4] This statement is different from the one where the prosecutor argued that Gorman-Lykken lied.

B.    Misstating Defense Theory in Rebuttal

Gorman-Lykken also argues that, during rebuttal, the prosecutor mischaracterized his defense theory.

Defense counsel explained in closing that if Gorman-Lykken established by a preponderance of the evidence that he reasonably believed NK was not mentally incapacitated or physically helpless, then the jury could find him not guilty. Defense counsel then made several arguments casting doubt on NK's credibility. Defense counsel also argued that because NK's blood test results were not admitted at trial, the jury should have questions about what sort of substances a pharmacologist might have found in her blood, and what effect a stimulant like Adderall would have in tandem with depressants.

Defense counsel also reminded the jury that Gorman-Lykken testified "about abuse of Oxycodone and abuse of Adderall by both he and [NK] and the history that they had of doing that. Shattering pills and snorting them to get a quick hit . . . [the prosecutor] could have called [NK] to the witness stand to rebut that. He didn't do it." RP (Sept. 15, 2017) at 434. And defense counsel argued,

> If you're looking at a trend, a habit of drug abuse involving those two drugs, Oxycodone and Adderall, in other words, an opioid and a central nervous system stimulant, all bets are off . . . about what that really is going to mean in someone's brain, and that has everything to do with how somebody might be if they have taken a whole cocktail of drugs like Oxycodone, Gabapentin, and alcohol, but at the same time they're under the influence of an amphetamine-type stimulant.

RP (Sept. 15, 2017) at 435.

The prosecutor responded in rebuttal, "According to the defendant—and his theory is basically this—that drug addicts can't be raped, and that's not true and that's not fair." RP (Sept. 15, 2017) at 443.

17

It is improper for a prosecutor to "misrepresent[ ] defense counsel's argument in rebuttal, effectively creating a straw man easily destroyed in the minds of the jury." *Thierry*, 190 Wn. App. at 694. But a prosecutor is entitled to fairly respond to defense's counsel's arguments and criticisms of the State's case. *Thorgerson*, 172 Wn.2d at 450.

Here, the prosecutor mischaracterized defense counsel's argument. Defense counsel's comments cannot fairly be interpreted as arguing that NK could not be raped because she was a drug addict. His statements about drug use were in the context of his argument that there were reasonable doubts regarding NK's mental incapacity and physical helplessness. He emphasized that there was "uncertainty about exactly what [NK's] mental state was." RP (Sept. 15, 2017) at 434. Defense counsel's argument was that nobody knew whether the combination of drugs that NK had taken would affect her ability to give consent to sex.

The court erred by failing to consider the prejudicial effect of the uniformed guard standing next to the Gorman-Lykken while he testified. The court erred by instructing the jury with an incorrect "to convict" jury instruction. The prosecutor made numerous improper comments in closing arguments. Because the cumulative errors in this trial produced a fundamentally unfair trial, I would reverse the conviction on that basis.

_____
Melnick, J.