# IN THE COURT OF APPEALS OF IOWA

———————————

No. 24-1691
Filed May 13, 2026

———————————

**State of Iowa,**
Plaintiff–Appellee,
v.
**James Mikale Wiggins,**
Defendant–Appellant.

———————————

Appeal from the Iowa District Court for Polk County,
The Honorable David Nelmark, Judge.

———————————

## CONVICTION VACATED, REMANDED FOR NEW TRIAL

———————————

Martha J. Lucey, State Appellate Defender, and Rachel C. Regenold
(argued), Assistant Appellate Defender, attorneys for appellant.

Brenna Bird, Attorney General, and Timothy Hau (argued), Assistant
Attorney General, attorneys for appellee.

———————————

Heard at oral argument
by Tabor, C.J., Sandy, J., and Doyle, S.J.
Opinion by Sandy, J.

**SANDY, Judge.**

"The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law." *Coffin v. United States*, 156 U.S. 432, 453 (1895).

When James Wiggins took the witness stand to tell the jury he had fired in self-defense, a uniformed deputy was stationed near him. No deputy had shadowed the State's witnesses—not even the convicted felon among them. The deputy was there, the district court explained, because Wiggins was in custody and "that is the Court's policy." The court declined to deviate from that policy. But under *State v. Wilson*, practices that single out the defendant as the one to be restrained may not rest on a generic policy; there must be a reason particularized to the defendant. 406 N.W.2d 442, 449–50 (Iowa 1987). No such reason appears in this record. So we vacate Wiggins's conviction and remand for a new trial.

Wiggins raises three additional claims: the evidence was insufficient to disprove justification; the jury instruction defining "malice" improperly retained aiding-and-abetting language; and the order requiring him to participate in a victim-offender dialogue is an illegal sentence. Because we vacate the conviction on due process grounds, we reach only the sufficiency claim, which we resolve against him.

## BACKGROUND FACTS & PROCEEDINGS

In December 2022, Wiggins was visiting Des Moines from Las Vegas, Nevada. He was in town visiting family before the holidays. While in town, he and his family also attended a funeral and repast on December 10.

After the repast, Wiggins, along with his brother Marcell Wiggins and their friend Lorenzo Reese, went to a local bar called Rico's on University Avenue. At the time, Wiggins was legally carrying his pistol. He had the gun "racked"[1] but the safety was on. Already at Rico's was Tyrone Hutchins, along with his friend Tina Sellers. Hutchins and Sellers were eating, drinking, and socializing with others at the bar. Hutchins was carrying his firearm that night as well.

Wiggins and Hutchins had been friends as children but had grown apart. Their respective groups of friends did not always get along, according to Wiggins. Wiggins testified that he did not know that Hutchins would be at Rico's that night. Marcell and Reese entered Rico's before Wiggins. Once inside, Marcell and Reese confronted Hutchins while he was sitting at the bar. During the confrontation, Hutchins drew his firearm and pointed it at Marcell and Reese. Marcell, Reese, and the group of people gathered behind them in the line of fire scattered. Hutchins then moved towards the front door of Rico's.

As the confrontation started and Hutchins drew his gun, Wiggins walked through the front door of Rico's. Hutchins moved towards the front door, still holding his gun. Hutchins also pushed T.H., a bystander, toward the door in front of him. As Hutchins reached the front door, Wiggins stepped to his right, drew his pistol, and fired two or three times[2] at Hutchins. After being struck by two bullets, Hutchins fell to the sidewalk outside of

---

[1] "Racking" means to pull and release the top slide of the pistol to chamber a round, making the pistol ready to fire.

[2] Evidence presented at trial was inconclusive as to whether Wiggins fired two or three times.

Rico's. A round also struck T.H. in her buttock. Hutchins died as a result of the gunshots.

Wiggins walked away from Rico's but turned around when he realized Marcell and Reese were not with him. Once they ran outside, the three walked to Marcell's car and drove away. Wiggins went to his sister's house and told her what happened. Wiggins then went to the Des Moines Police Department and turned himself in to the police, bringing his gun with him. Des Moines police released Wiggins that night and asked him to remain available. Wiggins returned to his home in Las Vegas and spoke to Detective Harden of the Des Moines Police Department several times over the ensuing months. Unbeknownst to Wiggins, a warrant for his arrest was issued, and he was arrested on February 2, 2024, in Las Vegas.

At trial, Wiggins testified in his own defense. The Polk County Courthouse has a policy that when a custodial defendant testifies, a deputy will be seated in the corner of the courtroom near the witness stand. At trial, the district court stated on the record:

> The Court has informed the parties off the record that because [Wiggins] is in custody, when he testifies, a deputy will be seated in the corner of the courtroom near to the witness stand. That is the Court's policy. Throughout the trial, deputies have been seated four or five feet behind [Wiggins]. There will be a similar situation with him on the witness stand. If the court did not follow that policy, [Wiggins] would be approximately three feet from the closest juror, and the closest deputy would be about 50 feet away from him, so the Court will not deviate from that policy.

Wiggins, having no prior notice of the policy, objected. He argued that it communicated to the jury that the defendant was dangerous and that having a uniformed officer so close to him while testifying impugned guilt onto Wiggins. The district court overruled the objection, stating that deputies had been sitting five feet behind the defendant throughout the trial

4

up until that point, and sat a deputy approximately five feet behind the witness box during Wiggins's and his sister's testimonies.[3]

Additionally, during the trial, Wiggins resisted the inclusion of an aiding-and-abetting instruction in the jury instructions. The State declined to argue its inclusion, so the district court did not include the instruction. However, Wiggins did not object to the instruction defining "malice," which included language about aiding and abetting.

Wiggins was convicted by a jury of second-degree murder. He was sentenced to fifty years in prison, with thirty-five of those years being mandatory. As part of his sentence, the district court ordered Wiggins to participate in a victim-offender-dialogue program. Wiggins now appeals.

## STANDARDS OF REVIEW

We apply de novo review for constitutional claims. *State v. Christensen*, 929 N.W.2d 646, 676 (Iowa 2019). We review courtroom security issues for an abuse of discretion. *Wilson*, 406 N.W.2d at 449. We review "sufficiency of the evidence claims for correction of errors at law." *State v. Jones*, 967 N.W.2d 336, 339 (Iowa 2021) (citations omitted). "[W]e are highly deferential to the jury's verdict. The jury's verdict binds this court if the verdict is supported by substantial evidence." *Id.*

## DISCUSSION

On appeal, Wiggins argues: (1) the district court's policy to place a deputy near the witness stand during his testimony violated due process, and that the district court failed to exercise its discretion when implementing the

---

[3] However, the only reason the deputy was near Wiggins's sister as she was testifying was because defense made such request after his objection was overruled.

security measure; (2) there was sufficient evidence that Wiggins acted in self-defense; (3) the district court erred in instructing the jury it could consider aiders and abettors' acts and conduct to find malice; and (4) the sentencing order requiring Wiggins to participate in a victim-offender dialogue is an illegal sentence.

## I.      Sufficiency of the Evidence

In order to prove that Wiggins was guilty of second-degree murder, the State was required to prove that (1) Wiggins shot Tyrone Hutchins on or about December 10, 2022, (2) Hutchins died as a result of being shot, (3) Wiggins acted with malice aforethought, and (4) Wiggins was not acting with justification. *See* Iowa Code §§ 707.2, 707.3 (2022). Wiggins argues there is sufficient evidence in the record to prove he acted with justification.

Iowa Code section 704.3 provides that someone is justified in using "reasonable force" to defend themselves or another person if they "reasonably believe[] that such force is necessary to defend oneself or another from any actual or imminent use of unlawful force." Deadly force is justified when it "is necessary to avoid injury or risk to one's life or safety or the life or safety of another." Iowa Code § 704.1(1). If this justification is established, it is a complete defense to the crime, and the burden shifts to the State to disprove it beyond a reasonable doubt. *State v. Ellison*, 985 N.W.2d 473, 477–79 (Iowa 2023).

When reviewing for sufficiency of the evidence, we view evidence presented at trial "in the light most favorable to the State." *State v. Crawford*, 972 N.W.2d 189, 202 (Iowa 2022). This includes all "legitimate inferences that may fairly and reasonably be deduced from the record." *State v. Williams*, 695 N.W.2d 23, 27 (Iowa 2005) (cleaned up) (citation omitted).

Taken in the light most favorable to the State, there is sufficient evidence in the record from which a reasonable juror could conclude that Wiggins was not acting with justification when he shot and killed Hutchins. Security camera footage showed that Wiggins had his hand on his pistol inside his jacket pocket before he entered Rico's. Once inside Rico's, Wiggins stepped out of the way of Hutchins's path towards the door and removed the safety of his pistol. He then shot Hutchins in the side and back as Hutchins was running towards the door.

The security footage from Rico's does not show whether Hutchins was aiming his pistol at Wiggins as he was moving towards the door. The jury had only Wiggins's testimony that Hutchins was aiming at him to rely on. Nor is there any forensic evidence to support Wiggins's claim that he believed Hutchins fired a shot at Marcell, Reese, or the crowd inside Rico's. Security cameras show Hutchins brandishing his firearm and pointing it at the group before running towards the exit. But there were no shell casings found associated with Hutchins's weapon, no bullet impacts inside Rico's, and no gunshot wounds besides Hutchins's and T.H.'s.

Viewing the evidence in the light most favorable to the State, we conclude there was sufficient evidence for a reasonable juror to conclude that Wiggins did not act with justification in his shooting of Hutchins. *See Crawford*, 972 N.W.2d at 202. "[I]t is not for us to interfere with the finding made [by a jury] when supported by substantial evidence, even though the evidence may have also supported a finding favorable to the defendant." *State v. Keeton*, 710 N.W.2d 531, 535 (Iowa 2006).

Even though we conclude that a reasonable jury could have found Wiggins guilty under our deferential standard of review, other prejudicial error in the case may still compel reversal of a conviction. *See State v. Sievers*,

20 N.W.3d 203, 208 (Iowa 2025). We thus turn to Wiggins's other assertion of error in his trial.

## II.  Due Process

Wiggins argues the courthouse policy to place a deputy behind the witness stand during his testimony violated his due process rights and was both inherently and actually prejudicial. Wiggins also contends the district court failed to exercise its discretion when implementing this security measure. The State argues the deputy's presence near the witness stand did not violate Wiggins's due process rights and that the district court did properly exercise its discretion in placing the deputy behind the witness stand during his testimony.

Wiggins raises this claim under both the United States Constitution and the Iowa Constitution. *See* U.S. Const. amend. XIV, § 1; Iowa Const. art. I, § 9 ("[N]o person shall be deprived of life liberty, or property, without due process of law."). "The presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice." *Estelle v. Williams*, 425 U.S. 501, 503 (1976); *see Wilson*, 406 N.W.2d at 448 ("[A] defendant is entitled to the indicia of innocence in the presence of the jury.").

Essential to due process is the right of every person accused of a crime to a fair and impartial trial. *See Estelle*, 425 U.S. at 503–04; *Drope v. Missouri*, 420 U.S. 162, 174–75 (1975); *Massey v. Moore*, 348 U.S. 105, 108 (1954); *Betts v. Brady*, 316 U.S. 455, 472–73 (1942). At its foundation stands the presumption of innocence—"a basic component of a fair trial under our system of criminal justice," *Estelle*, 425 U.S. at 503—long recognized to "lie[] at the foundation of the administration of our criminal law," *Coffin*, 156 U.S. at 453. To implement that presumption, courts must guard against

8

factors that "undermine the fairness of the factfinding process" and dilute the rule that guilt must be proved by evidence beyond a reasonable doubt. *Estelle*, 425 U.S. at 503 (citing *In re Winship*, 397 U.S. 358, 364 (1970)). It follows that the presumption of innocence requires the indicia of innocence, for "regardless of the ultimate outcome, or of the evidence awaiting presentation, every defendant is entitled to be brought before the court with the appearance, dignity, and self-respect of a free and innocent man." *Eaddy v. People*, 174 P.2d 717, 718 (Colo. 1946); *accord Anthony v. State*, 521 P.2d 486, 495 (Alaska 1974).

"Our supreme court has approached courtroom security cases mindful that not all errors at trial, even those of constitutional stature, necessarily dictate a reversal." *State v. Shipley*, 429 N.W.2d 567, 568 (Iowa Ct. App. 1988). In assessing due process implications of courtroom security, our supreme court recognizes:

> A trial judge . . . has a problem of balancing fair trial demands with security and safety. No trial is perfect. A judge looking back over a trial is in a better position than we are to say whether a reasonable accommodation of the two interests has been achieved; the judge is thus given considerable discretion in ruling on motion involving issues of this kind.

*Id*. (quoting *State v. Ellis*, 350 N.W.2d 178, 183 (Iowa 1984)).

However, certain courtroom security practices can offend these principles of due process. *Estelle*, 425 U.S. at 503–05. Forcing a defendant to appear in jail or prison attire before the jury is a "constant reminder of the accused's condition" and "may affect a juror's judgment." *Holbrook v. Flynn*, 475 U.S. 560, 568 (1986) (citation omitted). The Supreme Court held that this practice serves no "essential state policy" and found it to be unconstitutional. *Id*. (citation omitted).

A defendant may also be prejudiced if they appear before the jury in visible restraints or while bound and gagged. *Illinois v. Allen*, 397 U.S. 337, 344 (1970). The district court must have a sufficient case-specific basis to support the use of one of these measures, otherwise they are "inherently prejudicial" to the defendant during the trial process. *Id*. at 342–44; *see Wilson*, 406 N.W.2d at 449.

In *Holbrook*, the Supreme Court held that the mere presence of officers in the courtroom to provide security is not inherently prejudicial to a defendant's due process rights. 475 U.S. at 568–69. The Supreme Court provided:

> The chief feature that distinguishes the use of identifiable security officers from courtroom practices we might find inherently prejudicial is the wider range of inferences that a juror might reasonably draw from the officers' presence. While shackling and prison clothes are unmistakable indications of the need to separate a defendant from the community at large, the presence of guards at a defendant's trial need not be interpreted as a sign that he is particularly dangerous or culpable. Jurors may just as easily believe that the officers are there to guard against disruptions emanating from outside the courtroom or to ensure that tense courtroom exchanges do not erupt into violence. Indeed, it is entirely possible that jurors will not infer anything at all from the presence of the guards. If they are placed at some distance from the accused, security officers may well be perceived more as elements of an impressive drama than as reminders of the defendant's special status. Our society has become inured to the presence of armed guards in most public places; they are doubtless taken for granted so long as their numbers or weaponry do not suggest particular official concern or alarm.

*Id*. at 569 (citation omitted).

Unlike forcing a defendant to wear jail or prison garb and similarly to shackling a defendant, seating a deputy near a defendant can serve the legitimate interest of courtroom security. *See Wilson*, 406 N.W.2d at 449 ("In

certain instances, the defendant's right to the physical indicia of innocence before the jury must bow to the competing rights of participants in the courtroom and society at large to a safe and orderly trial."); *United States v. Samuel*, 431 F.2d 610, 615 (4th Cir. 1970). *Holbrook* informs us that having a deputy behind the defendant in the gallery while the defendant is at counsel table does not violate due process. 475 U.S. at 569 (citation omitted). But *Holbrook* does not specify whether its holding extends to a situation where a defendant is testifying in their own defense. There is no Iowa case law addressing this specific scenario.[4]

Indeed, there are a "wider range of inferences that a juror might reasonably draw" from an officer's presence in the courtroom. *Id.* (citation omitted). The inferences that a juror could make when a deputy suddenly appears behind the witness stand when it is the defendant's time to testify after being absent during the State's case-in-chief could certainly be negative towards the defendant. It indicates (1) the deputy is following the defendant

---

[4] We understand *Wilson* to require an actual prejudice finding only when a district court has found security measure is either (1) not inherently prejudicial, or (2) is inherently prejudicial but the court has made specific findings of fact as a basis for its use of the measure. 406 N.W.2d at 448–50. Further, *Wilson* required a showing of actual prejudice relative to a motion to change venue related to pre-trial publicity. 406 N.W.2d at 445 ("A defendant seeking reversal of a conviction on the basis of a denial of a motion for change of venue 'must show either actual prejudice on the part of the jury or must show that the publicity attending the case was so pervasive and inflammatory that prejudice must be presumed.'" (citation omitted)). However, when addressing the issue of shackling at trial, *Wilson* contemplates an actual prejudice analysis only because the shackling measure implemented was found to be inherently prejudice but permissible based on specific findings of fact. *Id.* at 449 ("On rare occasions, however, shackling a defendant may be justified despite the fact that some prejudice will occur."); *see Holbrook*, 475 U.S. at 572.

around the courtroom, and (2) the defendant is not allowed to be near the jurors without a deputy close by.

The question here lies between those poles. *Holbrook* approved security personnel "placed at some distance from the accused," reasoning that such officers "may well be perceived more as elements of an impressive drama than as reminders of the defendant's special status." *Id. Holbrook* did not address what happens when an officer leaves the gallery to station himself behind the defendant—and only the defendant[5]—as he testifies. That is the practice we confront.

We hold the practice is inherently prejudicial and that, like the shackling at issue in *Wilson*, it must be justified by case-specific findings of necessity rather than by a generic courthouse policy. Two features of the record drive that conclusion.

First, the policy was defendant-focused. The *Holbrook* Court drew the line where it did because security officers posted generally throughout the courtroom invite many innocent inferences: that they are there to prevent disruption from the gallery, to keep tensions from boiling over, and to provide ordinary security. *Id.* But a deputy who appears behind the witness box only when the defendant takes the stand sheds those alternative explanations. The arrangement is no longer general; it is particular. The California Supreme Court dealt with a similar set of facts in *People v. Stevens*, where a deputy sat near the witness stand during the defendant's testimony. 47 Cal.4th 625, 639

---

[5] The State notes that a deputy also sat near Wiggins's sister as she testified. So he did—but only at defense counsel's request, after the objection had been overruled. An accommodation extracted by the losing party, after losing, does not undo the prejudice. Of note, the deputy did not stand behind the witness box when one of the State's witnesses—a convicted felon—testified.

(Cal. 2009). As Justice Moreno explained in dissent, the stationing of a uniformed officer next to a defendant as he testifies is the kind of government action that "constitutes an 'unmistakable indication[] of the need to separate a defendant from the community at large.'" 47 Cal.4th at 644 (Moreno, J., dissenting) (quoting *Holbrook*, 475 U.S. at 569). It "suggest[s] to the jury that the trial court has determined a need for security personnel to interpose themselves between the defendant and the jury box.[6]" *Id.* at 649. The natural inference—perhaps the only inference—is that the court itself has assessed this defendant and found him dangerous enough to warrant a guard.

That inference is precisely what *Wilson* identified as the gravamen of inherent prejudice: a practice that "tends to create prejudice in the minds of the jurors by suggesting that the defendant is an obviously bad and dangerous person whose guilt is a foregone conclusion." 406 N.W.2d at 449. Where the only person in the courtroom singled out by an officer's close attention is the defendant on the witness stand, the suggestion arrives without subtlety.

---

[6] Cases from other jurisdictions with similar fact patterns can be meaningfully distinguished from the present case. In *Stevens*, while ultimately holding that stationing a security officer near the witness stand during the defendant's testimony is not inherently prejudicial, the California Supreme Court held the district court must still "exercise its own discretion in ordering such a procedure and may not simply defer to a generic policy." 47 Cal.4th at 644. In *State v. Gorman-Lykken*, the Washington Court of Appeals held the district court "abused its discretion by failing to analyze whether any case-specific reasons other than the officer's preference supported the need for the security measure." 446 P.3d 694, 697 (Wash. Ct. App. 2019).

Importantly, *Stevens* and *Gorman-Lykken* were cases that involved a self-defense claim by the defendant. Such a claim centrally revolves around whether the jury finds the defendant's self-attested justification and credibility as to the danger he may or may not have felt. It greatly distinguishes these other cases from that which is before us.

The State's response—that a deputy sat four or five feet behind Wiggins at counsel table throughout the trial, so a deputy four or five feet behind him at the witness stand will be no more prejudicial—does not survive examination. A deputy stationed behind a defendant at counsel table sits among an array of courtroom personnel; the inference of generalized order is available. But when only the defendant rises and walks to the witness box, and a deputy is already there waiting, the decision announces itself as personal rather than general. *Cf. Stevens*, 47 Cal.4th at 650 (Moreno, J., dissenting) ("The very nature of the arrangement underscored that it was focused on defendant and the risk he might pose."). The juror who might have ignored the deputy at counsel table can hardly ignore the deputy who shadows the defendant—alone from all other witnesses—to the stand.[7]

Second, the record discloses no case-specific findings of necessity. As the district court explained, "[t]hat is the Court's policy" and "the Court will not deviate from that policy." The district court added that without the policy, the defendant would sit roughly three feet from the nearest juror, with the nearest deputy fifty feet away. Those are general observations about courtroom layout. They are not findings about Wiggins. The record contains no determination that Wiggins had threatened violence, attempted escape, behaved disruptively, or had otherwise given the court reason to believe heightened restraint of his person was needed during his testimony. Compare this to *Wilson*, where the trial court placed on the record before trial that shackling was necessary "in view of the past history of the defendant . . . and to preclude any possibility that he might make a renewed effort [to

---

[7] The record here makes the point sharper still. A deputy was also placed near the witness stand during the testimony of Wiggins's sister—but only because defense counsel, having lost his objection, asked for that to happen. The courthouse policy as written and as administered clearly targets the testifying defendant.

escape]"—the defendant having assaulted a deputy and locked jail employees in a cell during a prior escape.[8] 406 N.W.2d at 449.

That distinction is decisive. *Wilson* did not merely approve shackling; it set a predicate procedure trial judges must follow before allowing inherently prejudicial practices to occur. "We believe the procedure followed by the district court in this case should be utilized by all courts that find it necessary to employ security measures that are inherently prejudicial." *Id*. "The district court, preferably before the trial begins, should place in the record in the presence of the defendant and counsel the reasons for shackling and give them an opportunity to make their objections known." *Id*. at 449–50 (quoting *State v. Tolley*, 226 S.E.2d 353, 369 (N.C. 1976)). And "it would be the better practice to hold a formal hearing and to make *specific findings of fact* as a basis for the court's discretionary ruling." *Wilson*, 406 N.W.2d at 450 (emphasis added). *Tolley*, which our supreme court quoted as a basis for its predicate procedure, clarified that specific findings of fact include:

> the seriousness of the present charge against the defendant; defendant's temperament and character; his age and physical attributes; his past record; past escapes or attempted escapes, and evidence of a present plan to escape; threats to harm others or cause a disturbance; self-destructive tendencies; the risk of mob violence or of attempted revenge by others; the possibility of rescue by other offenders still at large; the size and mood of the audience; the nature and physical security of the courtroom; and the adequacy and availability of alternative remedies.

---

[8] We, therefore, do not reach an actual prejudice analysis because we find the security measure inherently prejudicial and because the district court made no specific findings of fact as a basis to implement the measure. *See Holbrook*, 475 U.S. at 572 (requiring an actual prejudice analysis only when a challenged practice is inherently prejudicial).

226 S.E.2d at 368. In other words, the measures must be tailored to the specific defendant, not to defendants as a class.

A blanket courthouse policy cannot satisfy that command. To say "this defendant is in custody, therefore a deputy will sit behind him while he testifies" is to announce that the relevant question is whether the defendant is in custody—a fact the jury is instructed to disregard. *See* Iowa State Bar Ass'n, Iowa Crim. Jury Instruction 100.6 (2022). It is to substitute a category for a finding. The trial court here did exactly that: it identified a policy, applied it, and declined to deviate. Discretion not exercised is discretion abused.

We therefore hold that placing a deputy behind the witness stand during a custodial defendant's testimony—when no equivalent shadowing attends the State's witnesses, and when the practice rests on a categorical policy rather than a case-specific finding—is inherently prejudicial and may not stand without a record showing of manifest need. The State bears the burden of making that showing. *See Wilson*, 406 N.W.2d at 449. It made no such finding here.

We do not announce a rule dictating where deputies may sit in Iowa courtrooms.[9] We hold only what *Wilson* already requires: that practices which

---

[9] Ideally, when implementing a security measure like stationing a deputy directly behind the witness stand during a custodial defendant's testimony (but not for witnesses from the State), the district court would make findings regarding a defendant's individual characteristics, background, and prior demeanor or behavior at trial leading up to their own testimony. Those findings would assist the court in determining the necessity of such a measure.

Alternatively, the district court could alert both parties to the policy before the State's presentation of evidence and provide the opportunity to have the deputy placed behind the witness stand during all testimony. This measure would serve to fulfill court

single out the defendant as the one whom the law must restrain require something more than a general policy. They require a reason particularized to the defendant. Self-defense was Wiggins's defense, and the jury was instructed accordingly. That instruction placed the burden on the State to disprove justification beyond a reasonable doubt. *See State v. Ellison*, 985 N.W.2d 473, 477–79 (Iowa 2023). The case therefore came down to whether the jury believed Wiggins when he said Hutchins was aiming a gun at him. Credibility was not one factor among many; it was the primary factor. And the prejudice we have identified—a practice that, in *Wilson's* words, suggests "the defendant is an obviously bad and dangerous person," 406 N.W.2d at 449, operates precisely on that judgment. We cannot say the error was harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 24 (1967). We reverse and remand for a new trial.

**CONVICTION VACATED, REMANDED FOR NEW TRIAL.**

---

policy while also not singling out the defendant as a potential threat. We recognize that law enforcement staffing availability may create limits to this approach. But every possible measure should be taken to protect the defendant's right to a fair trial, even when making security decisions.

Another possible solution could be to emulate the approach that Washington and California have adopted to navigate the same issue, which requires the court to "(1) state case-specific reasons for the need for such a security matter, and (2) determine that the need for the security measure outweighs the potential prejudice to the testifying defendant." *See Gorman-Lykken*, 446 P.3d. at 696, 699; *Stevens*, 218 P.3d at 285.