IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 81166-5-I |
| Respondent, | DIVISION ONE |
| v. | PUBLISHED OPINION |
| MIGUEL ANTONIO BEJAR, JR., | |
| Appellant. | |

COBURN, J. — Miguel Antonio Bejar, Jr. appeals his convictions for murder in the first degree with a firearm enhancement and unlawful possession of a firearm in the first degree. Bejar objects to the secondary security screening ordered by the trial court. We conclude that neither requiring the jurors to go through the secondary screening on the first day of trial nor posting the court's order on courtroom security on the courtroom door was inherently prejudicial. The court did not abuse its discretion in ordering the secondary screening measures here. We affirm.

FACTS

Arturo Alvarez was killed in a drive-by shooting in April 2017. After the investigation, the State eventually charged appellant Miguel Antonio Bejar, Jr. and Antonio Inda, Bejar's codefendant at trial, with Alvarez's murder. The State charged each defendant with murder in the first and second degrees and in both

Citations and pin cites are based on the Westlaw online version of the cited material.

counts alleged that they were armed with a handgun at the time (firearm enhancement). The State further charged Bejar and Inda with unlawful possession of a firearm — Bejar in the first degree and Inda in the second degree.

According to the State, the shooting of Alvarez was part of a gang war in South King County that was instigated by gang members disrespecting each other over social media. At trial, the State presented evidence that Bejar was a member of the South Side Locos gang and Inda was a member of the Varrio Locos gang. The State's theory was that the South Side Locos and the Varrio Locos were united in a gang war against the United Lokotes gang, of which Alvarez was a member.

At an omnibus hearing in August 2019, the court brought up the issue of security measures for trial and said that after reviewing the certificate of probable cause and everything in the court file, its inclination was to have secondary security measures in place during trial. The prosecutor stated that secondary security was "absolutely necessary" because one of the State's witnesses had been shot and another assaulted.

At a later status conference, the court and the parties again discussed the issue of a secondary security screening outside the courtroom during trial. The prosecutor explained that the State's security concern was for the use of cell phones in the courtroom because another member of Varrio Locos had shot one of the State's witnesses and the defendant's girlfriend posted the certificate for probable cause on the messaging application Snapchat with the caption "You

snitch once and get shot, you going to snitch again?" The prosecutor explained, "So my concern is if there are cell phones in this courtroom, we run the risk of continued witness intimidation, continued witness tampering, continued calls to the various groups that might be interested in this case to retaliate for testimony, for cooperation, and that places the [S]tate's witnesses in danger." Attorneys for Bejar and Inda expressed concerns that a secondary security screening would prejudice their clients.

Toward the end of the discussion, the court stated that if it ordered secondary screening, it would post the order on the courtroom door: "And if I do do [sic] secondary screening, I would do it in the form of an order that we would put on the court door so that any of the parties coming in, or any of the jurors coming in will know that this is what the court has ordered specifically for secondary screening, so there is a minimum of pushback to any of the officers working outside." The court reserved ruling on the issue and invited the parties to submit briefing within the week. Bejar filed a written memorandum opposing secondary screening measures.

At a September 10, 2019 hearing on pretrial motions, the court and the parties revisited the issue of secondary screening. The prosecutor said that one of the State's witnesses, S.E.B., a juvenile, had been shot by another individual, F.H.B. The prosecutor said that F.H.B. called S.E.B. a snitch on social media in the months before he shot him. The prosecutor said that before F.H.B.'s bail hearing, in July 2019, there was a Snapchat post that showed the certification for probable cause for S.E.B.'s shooting with text stating, "You're going to snitch

3

once, get shot, and then snitch again[?]" And it had "VL" on it, which was apparently for Varrio Locos. Weeks prior to the shooting, the prosecutor said Inda called S.E.B. from the juvenile detention facility and asked if he was going to testify.

The prosecutor further stated a group of people associated with Varrio Locos had assaulted another of the State's witnesses, S.C., and S.C. said he overheard them talking about the assault being at the behest of Inda. The prosecutor also reported an incident disclosed to the State in discovery where Inda assaulted a United Lokotes member, who is the cousin of the victim in this case, at a juvenile detention facility.

The next day, September 11, 2019, after more discussion on the secondary screening issue, the court orally ruled that it was going to order secondary screening:

> And so I am going to order secondary security. I think it's clear that these particular defendants have been perfectly appropriate in court and they in and of themselves are not a security risk. Secondary security is strictly for any courtroom observers that come in.
> I am going to make a finding that secondary security is not inherently prejudicial. It is not aimed at the defendants. It is not a blanket security order that was relied on in Hertzog.
> The nature of the allegations in this case involve ongoing gang violence between two different gangs with multiple social media postings. That in particular is what inflamed the gang war, and these are the allegations. It certainly is not fully proven, but it is what the Court needs to take into consideration.
>
> . . .
>
> There's been allegations of witnesses being assaulted as a result of this ongoing gang war, and in particular Facebook posts that I read provided here refer to different people as being snitches.
> The Court cannot monitor cellphone recordings. Cell phones in and of themselves are small enough. They can be used in a way in which it is impossible for both myself or the court staff to determine whether or not

4

anyone is recording.

. . .

It does appear that the defendants and their friends have consistently used Facebook or other social media to get information out, which does increase the risk of widespread dissemination of information and increases the risk to witnesses in this case.

Unlike Hertzog and even Gorman,[1] these security measures are not aimed at the defendants particularly, and they will not necessarily be imputed to the defendants.

The court further explained that it would minimize prejudice to the defendants by locating the secondary security screening "through the whole hallway, meaning that any of the courtrooms up and down the hallway will be subject to secondary security."

Accordingly, the court issued a written order on courtroom security to take effect beginning October 14, 2019, which was the first day of trial. In the first paragraph, the order stated its purpose: "The purpose of this Order is to provide the parties a fair trial, to preserve the dignity of these proceedings, and ensure witness safety." The order described the secondary screening measures as follows:

1. Persons entering the courtroom may be subjected to secondary screening, including use of a magnetometer, handheld metal detector, and pat down searches. Persons who fail to comply with screening requirements will not be permitted access to the courtroom.

2. Except as specifically authorized in this document or by separate order of the Court, no cell phones, cameras, or other electronic devices capable of audio or video recording, or component parts of such devices, will be permitted in the

---

[1] The court was referring to the cases of State v. Hartzog, 96 Wn.2d 383, 635 P.2d 694 (1981) and State v. Gorman-Lykken, 9 Wn. App. 2d 687, 696, 446 P.3d 694 (2019).

courtroom. Persons entering the courtroom may be required to leave such devices with security personnel . . .

The order stated that jurors were required to go through secondary screening but could keep their laptops, tablets, and cell phones as long as they were wearing their juror badges.

The secondary screening started on the first day of trial. At the end of the day, outside the presence of the jury, the court and the parties revisited the issue of the secondary screening. Responding to an objection by Bejar's attorney to the location of the secondary screening just outside the courtroom, the court explained that the secondary security screening applied to three other courtrooms on the same floor. The court determined that jurors should be able to bypass secondary screening with their juror badges. Accordingly, the court issued a written first-amended order on courtroom security allowing jurors to bypass secondary screening and keep their laptops, tablets, and cell phones as long as they were wearing their juror badges.

About two weeks later, the court issued a written second amended order on courtroom security allowing people in the courtroom who had left their devices with security personnel to retrieve the devices during the lunch recess.

The jury convicted Bejar of murder in the first degree with a firearm enhancement and, after subsequent proceedings, on the unlawful possession of a firearm charge as well. The jury convicted Inda of murder in the second degree with a firearm enhancement and unlawful possession of a firearm.

Bejar appeals.

DISCUSSION

6

Bejar raises one issue on appeal: an objection to the secondary screening ordered by the trial court.

The trial court has broad discretion to make trial management decisions, including provisions for the order and security of the courtroom, because the trial court is generally in the best position to perceive and structure its own proceedings. State v. Dye, 178 Wn.2d 541, 547-48, 309 P.3d 1192 (2013). Therefore, we review a trial court's ruling regarding security measures for an abuse of discretion. Id. at 548. See also State v. Jaime, 168 Wn.2d 857, 865, 233 P.3d 554 (2010).

Inherently Prejudicial

First, Bejar argues that requiring jurors to go through secondary screening on the first day of trial and posting the applicable order on the courtroom door was inherently prejudicial.[2]

The presumption of innocence is a basic component of a fair trial under our system of justice. Jaime, 168 Wn.2d at 861. In order to preserve a defendant's presumption of innocence before a jury, the defendant is entitled to the physical indicia of innocence which includes the right of the defendant to be brought before the court with the appearance, dignity, and self-respect of a free and innocent individual. Id. at 861-62. Measures which single out a defendant as a particularly dangerous or guilty person threaten his constitutional right to a

---

[2] Bejar describes posting the order on the courtroom door as "expressly" prejudicial. He fails to provide any legal authority for a separate "expressly" prejudicial standard or analysis; we analyze his claim under the inherently prejudicial standard.

fair trial. Id. at 862. Such measures threaten a defendant's right to a fair trial because they erode his presumption of innocence; these types of courtroom practices are inherently prejudicial. Id.

When a courtroom arrangement is challenged as inherently prejudicial, the question to be answered is whether it presents an unacceptable risk of impermissible factors coming into play. Jaime, 168 Wn.2d at 862.

In Holbrook v. Flynn, the United States Supreme Court considered whether the presence of security guards in the courtroom was inherently prejudicial. 475 U.S. 560, 568-69, 106 S. Ct. 1340, 89 L. Ed. 2d 525 (1986). Concluding that the presence of security guards generally was not inherently prejudicial, the Court explained the wide range of inferences that might be drawn from the officers' presence:

> The chief feature that distinguishes the use of identifiable security officers from courtroom practices we might find inherently prejudicial is the wider range of inferences that a juror might reasonably draw from the officers' presence. While shackling and prison clothes are unmistakable indications of the need to separate a defendant from the community at large, the presence of guards at a defendant's trial need not be interpreted as a sign that he is particularly dangerous or culpable. Jurors may just as easily believe that the officers are there to guard against disruptions emanating from outside the courtroom or to ensure that tense courtroom exchanges do not erupt into violence. Indeed, it is entirely possible that jurors will not infer anything at all from the presence of the guards.

Holbrook, 475 U.S. at 569.

The Court also found it significant that "our society has become inured to the presence of armed guards in most public places; they are doubtless taken for granted so long as their numbers or weaponry do not suggest particular official

concern or alarm." Id. at 569.

Drawing from the Holbrook analysis, the Washington Supreme Court in Jaime, analyzing the claim that holding trial in a jailhouse setting was inherently prejudicial, framed the issue as: "the question here is whether the average juror would take for granted his or her presence in a jail, i.e., whether jurors are so inured to the experience of being in a jail building that it would have no effect on their perspective as jurors." Jaime, 168 Wn.2d at 863. The court said that " 'reason, principle, and common human experience' tell us that the average juror does not take for granted a visit to a jail." Id. at 863 (quoting Holbrook, 475 U.S. at 569)). The court concluded that holding the trial in a jailhouse courtroom was inherently prejudicial because the setting was not a courthouse, a public building whose purpose is to provide a neutral place to conduct the business of the law. And the jail setting that replaced the courthouse had a purpose and function that was decidedly not neutral, commonplace, or routine. Id. at 864.

The Ninth Circuit subsequently used the Holbrook court's reasoning to hold that entry-screening procedures—similar to those used in Bejar's case— were not inherently prejudicial in the case of Hayes v. Ayers, 632 F.3d 500, 522 (9th Cir. 2011). Over Hayes's objection, the trial court permitted screening of everyone who entered the courtroom. Id. at 521. The screening measures included the use of a handheld metal detector and pat down searches, just as in Bejar's case. Id. The Ninth Circuit concluded that Holbrook's logic permitted these entry-screening procedures:

> Holbrook directly establishes that the placement of deputies in and outside the courtroom at Hayes's trial was not inherently

prejudicial. See also Williams v. Woodford, 384 F.3d 567, 588 (9th Cir. 2004) (denying habeas relief because placement of additional security personnel in the courtroom was not inherently prejudicial). Holbrook's logic also permits the entry-screening procedures. If uniformed guards sitting directly behind a defendant "need not be interpreted as a sign that he is particularly dangerous or culpable," 475 U.S. at 569, 106 S. Ct. 1340, *then the mere screening of all who enter the courtroom certainly should not be. Indiscriminate screening at the courtroom door permits an even "wider range of inferences" than strategically placed guards, and it suggests even more strongly that the security is designed "to guard against disruptions emanating from outside the courtroom."*

Hayes v. Ayers, 632 F.3d 500, 522 (9th Cir. 2011) (emphasis added).

Bejar first argues that requiring jurors to go through the secondary screening on the first day of trial was inherently prejudicial. The question is whether the average juror would take for granted a secondary screening, including metal detectors or a pat down search, to ensure cell phones or other devices were not brought into the courtroom, i.e., whether jurors are so inured to the experience of security screenings that it would have no effect on their perspective as jurors. Holbrook, 475 U.S. at 569; Jaime, 168 Wn.2d at 863.

" 'Reason, principle, and common human experience' " tell us that the average juror takes for granted security screenings in courthouses and other similar government buildings. See Jaime, 168 Wn.2d at 863. Jurors are inured to passing through security screening, including metal detectors and pat down searches, when entering government buildings or government-controlled spaces within buildings, including airports and other transportation hubs, federal buildings, and courts. The fact that there was a secondary screening outside the courtroom in the hallway for cell phones did not suggest particular official concern or alarm; it was not an invasive search or conducted by guards with

10

unusual weaponry or armed presence. See Holbrook, 475 U.S. at 569.

The secondary screening allowed for a wide range of inferences, including that such screening was designed to guard against disruptions emanating from outside the courtroom. See Holbrook, 475 U.S. at 569; Hayes v. Ayers, 632 F.3d at 522. The secondary screening was located outside the courtroom. The secondary screening applied to three other courtrooms and not only the courtroom where Bejar's trial was being conducted. The jurors only had to pass through the secondary screening on the first day of trial. On all subsequent days, jurors were allowed to bypass the secondary screening with their juror badges. These factors all served to minimize any potential prejudice to the defendants. The secondary screening of the jurors on the first day of trial was not inherently prejudicial.

Next, Bejar argues that posting the court's courtroom security order on the courtroom door was also prejudicial because one of the listed purposes of the order was to "ensure witness safety."

As a preliminary matter, the State responds that the record does not support Bejar's claim that the court's order was posted on the courtroom door. While the record supports the court's intention to post its security order on the courtroom door, nothing in the record establishes whether the initial order or the two subsequent amended orders were actually posted and visible to the jurors or not posted at all.

Even assuming the order was posted on the courtroom door, we conclude it was not inherently prejudicial for the reasons detailed below; therefore, we

presume it was posted for the purposes of our analysis. State v. Jasper, 174 Wn.2d 96, 123-24, 271 P.3d 876 (2012) (quoting Barker v. Weeks, 182 Wn.2d 384, 391, 47 P.2d 1 (1935) ("On a partial or incomplete record, the appellate court will presume any conceivable state of facts within the scope of the pleadings and not inconsistent with the record which will sustain and support the ruling or decision complained of; but it will not, for the purpose of finding reversible error, presume the existence of facts as to which the record is silent.").

Turning to the substance of Bejar's argument, jurors could reasonably draw a wide range of inferences from the written order. The order is three pages long, double spaced, and appears to be in regular-sized font. In the first paragraph, the order (and each amended order) states in relevant part: "The purpose of this Order is to provide the parties a fair trial, to preserve the dignity of these proceedings, and ensure witness safety." Ensuring witness safety is only one of the listed purposes and is counterbalanced by the other listed purposes of a fair trial and preserving the dignity of the proceedings. Bejar objects to only three words of the lengthy document which are in no way emphasized, highlighted, or conspicuous.

According to Bejar, the order was posted on the outside of the courtroom door. The "ensure witness safety" language could have easily been understood to suggest that the secondary screening was designed to guard against disruptions emanating from outside the courtroom, especially since the secondary screening and the order were both located outside the courtroom and the screening was applicable to three other courtrooms. See Holbrook, 475 U.S.

at 569; Hayes v. Ayers, 632 F.3d at 522.

Although most of the witnesses at trial were the State's, the defense—Inda's attorney—did call two witnesses, including Inda; the fact that two parties called witnesses would allow jurors to draw an even wider range of inferences from the "to ensure witness safety" language. The order was not specific to Bejar and was not an "unmistakable indication" of the need to separate Bejar from the community at large. See Holbrook, 475 U.S. at 569. It need not be interpreted as a sign that Bejar was particularly dangerous or culpable. See Holbrook, 475 U.S. at 569; Hayes v. Ayers, 632 F.3d at 522.

In short, requiring jurors to go through a secondary screening on the first day of trial and posting a written order on the courtroom door stand in stark contrast to other security measures found inherently prejudicial, such as holding a trial in a jailhouse and shackling a defendant. See Jaime, 168 Wn.2d at 863-64 (holding a trial in a jailhouse courtroom is inherently prejudicial); Finch, 137 Wn.2d at 844-47 (inherently prejudicial for a defendant to appear before a jury in shackles). This secondary screening here is more similar to Holbrook and Hayes where the Supreme Court and the Ninth Circuit respectively found that courtroom security guards and courtroom entry-screening procedures similar to those used here were not inherently prejudicial. We conclude that neither requiring the jurors to go through secondary screening on the first day of trial nor posting the court's written courtroom security order on the courtroom door was inherently

prejudicial.

Trial Court's Findings Regarding the Secondary Screening

Bejar further argues that the trial court failed to make written findings justifying the secondary screening of all persons entering the courtroom. We review the court's ruling for an abuse of discretion. Dye, 178 Wn.2d at 548.

"For routine security measures such as the presence of officers in the courtroom, no specific inquiry on the record is required for the trial court's exercise of discretion." State v. Gorman-Lykken, 9 Wn. App. 2d 687, 696, 446 P.3d 694 (2019). However, when a security officer is stationed next to the witness stand when a defendant testifies, the trial court must "(1) state case-specific reasons for the need for such a security measure, and (2) determine that the need for the security measure outweighs the potential prejudice to the testifying defendant." Id. at 697. Neither party contends the security measures taken in the instant case were "routine." Nor is the circumstance similar to what occurred in Gorman. Regardless, Bejar fails to cite any authority requiring that findings be written, and we decline to adopt such a requirement.

The trial court listed the following case-specific reasons that secondary screening was needed: the nature of the allegations involved ongoing gang violence including multiple social media postings that allegedly inflamed the gang war; there were allegations of witnesses being assaulted as a result of the ongoing gang war, including social media posts referring to different people as being snitches; court staff could not monitor cellphone recordings in the courtroom; and defendants and their friends consistently used Facebook and

14

other social media platforms to get information out, which increased the risk of widespread dissemination of information and increased the risk to witnesses in this case.

The court also determined that the secondary screening was not aimed at the defendants particularly, and it applied to multiple courtrooms on the same floor. The posted order explained multiple reasons for restricting audio and recording devices from the courtroom, which included providing the parties a fair trial and to preserve the dignity of the proceedings in addition to ensuring witness safety. These secondary security measures did not single out a defendant as a particularly dangerous or guilty person or threaten his constitutional right to a fair trial. The trial court did not abuse its discretion in adopting such measures.

Affirmed.

_Coburn, J._

WE CONCUR:

_Dwyer, J._    _Appelwick, J._