IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>       Respondent,<br><br>   v.<br><br>RAYMOND WALTER SANCHEZ,<br><br>        Appellant. | No. 83686-2-I<br><br>DIVISION ONE<br><br>ORDER GRANTING MOTION<br>TO PUBLISH IN PART |

Respondent, State of Washington, filed a motion to publish in part the opinion filed on January 2, 2024 in the above case. Appellant, Raymond Walter Sanchez, filed an answer stating that the appellant takes no position on the motion. A majority of the panel has determined that the motion should be granted and the opinion through heading II, section C, concluding at the end of the first full paragraph on page 19 be printed in the Washington Appellate Reports. The remainder of the opinion starting at section D on page 19 shall not be published pursuant to RCW 2.06.040.

Now, therefore, it is hereby

No. 83686-2-I/2

ORDERED that the motion to publish in part is granted.  The opinion filed on January 2, 2024 shall be published through heading II, section C, at the end of the first full paragraph on page 19.

FOR THE COURT:

Díaz, J.

Judge

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 83686-2-I |
| Respondent, | |
| v. | DIVISION ONE |
| RAYMOND WALTER SANCHEZ, | UNPUBLISHED OPINION |
| Appellant. | |

DíAZ, J. — A jury convicted Raymond Sanchez of two counts of murder in the second degree. He now claims his attorney should have offered a different justifiable homicide instruction, and that the trial court erred by giving a first aggressor jury instruction and by refusing to give a lesser included instruction for manslaughter in the second degree. He also asserts a Seattle police detective offered improper opinion testimony, as well as alleging other irregularities with the trial and sentence. We remand the matter to the trial court solely to strike certain fees it assessed. Otherwise, we affirm.

I.    BACKGROUND

On January 25, 2016, Seattle police discovered Larry Humphrey and Holger Sippach dead in a Belltown area apartment. As was immediately apparent and later confirmed by the medical examiner, the men died violently and had been

deceased for some time. Specifically, the autopsies documented many "chop-force-type wounds" on both victims' heads, including skull fractures. Humphrey sustained at least six of these head wounds, Sippach received fourteen. Numerous other lacerations were identified elsewhere on the victims' bodies. These wounds were consistent with the use of a heavy, sharp, weapon. These injuries occurred up to two weeks prior to the bodies' discovery.

In May 2017, the Washington State Patrol Crime Lab connected a DNA sample found at the crime scene to Sanchez. The following month, two Seattle police detectives traveled to Greenville, South Carolina to question Sanchez. During the questioning, Sanchez admitted to hitting both Humphrey and Sippach with a machete on January 10, 2016. The State charged Sanchez with two counts of murder in the second degree.

At trial, Sanchez raised claims of self-defense and voluntary intoxication. Specifically, he testified he was in Seattle on a "drug vacation" and went to Humphrey's apartment to buy methamphetamine. While there, Sanchez consumed meth, fell asleep and, when he woke up, he claims Sippach was attempting to sexually assault him. Sanchez testified he believed his drugs had been spiked with gamma-Hydroxybutyric acid ("GHB"),[1] which triggered his Post-Traumatic Stress Disorder ("PTSD"). Sanchez's PTSD stemmed from a similar incident in the same apartment when he unknowingly consumed GHB and was

---

[1] GHB is a central nervous system depressant. An expert forensic toxicologist stated it can cause "sedation, decreased inhibition . . . and at higher levels, lead to unconsciousness or even death." As such, it is widely referred to as a "date rape drug . . . because of its sedative properties [and] that it could be administered surreptitiously into, like, a person's alcoholic beverage[.]"

sexually assaulted with Humphrey present.

This time, Sanchez testified he found a bottle of clear liquid he believed was GHB and poured out the bottle, which angered Humphrey. As will be described in more detail below, a fight ensued and Sanchez hit both men with a machete, claiming he only intended to injure them. Sanchez further testified he only remembered hitting Sippach twice in the arm with the machete and Humphrey once "up side the head." As will be elaborated on below, Sanchez's medical expert, Dr. Stanfill, testified on Sanchez's history of substance abuse, his mental health conditions, and his mental state on the day of the killings.

On November 1, 2021, the jury found Sanchez guilty on both counts, with a deadly weapon enhancement for each. Sanchez was sentenced to 30 years in prison.

## II.    ANALYSIS

### A.    Ineffective Assistance of Counsel (Justifiable Homicide Instruction)

Sanchez argues he was "denied his right to effective assistance of counsel when defense counsel failed to ensure the jury was properly instructed such that it could adequately assess Sanchez's self-defense claim in the context of his mental health disorders."

Following Strickland v. Washington, 466 U.S. 668, 669, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), Washington follows a two-prong test for ineffective assistance of counsel. State v. Sardina, 42 Wn. App. 533, 540, 713 P.2d 122 (1986) ("we hold that the Strickland test should be applied by Washington courts to issues of ineffective assistance of counsel"). First, under the performance

prong, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." Strickland, 466 U.S. at 669. However, "[a] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689. Second, under the prejudice prong, the defendant must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 669. "A reasonable probability is a probability sufficient to undermine confidence in the outcome" after considering the totality of evidence that was before the judge or jury. Id.

In line with Strickland, we first consider whether Sanchez's trial counsel proposed an objectively unreasonable jury instruction in support of his self-defense claim. In general, "[j]ury instructions are sufficient if they correctly state the law, are not misleading, and allow the parties to argue their respective theories of the case." State v. Walters, 162 Wn. App. 74, 82, 255 P.3d 835 (2011).

Sanchez's trial counsel proposed, and the trial court gave, the standard pattern jury instruction for justifiable homicide, which instructed the jury that:

> Homicide is justifiable when committed in the lawful defense of the slayer when: . . .
>
> (3) the slayer employed such force and means as a reasonably prudent person would use under the same or similar conditions as they reasonably appeared to the slayer, *taking into consideration all the facts and circumstances as they appeared to him*, at the time of and prior to the incident.

11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 16.02 (5th ed. 2021) ("WPIC").

Paragraph (3) of WPIC 16.02 was added in response to our Supreme Court

holding that a prior version of the instruction did "not instruct the jury to consider the conditions as they appeared to the slayer" in line with the subjective test set forth in State v. Wanrow. State v. Allery, 101 Wn.2d 591, 682 P.2d 312 (1984), abrogated on other grounds by State v. O'Hara, 167 Wn.2d 91, 98, 217 P.3d 756 (2009); State v. Wanrow, 88 Wn.2d 221, 239, 559 P.2d 548 (1977) (when raising a claim of self-defense, the "defendant's actions are to be judged against her own subjective impressions and not those which a detached jury might determine to be objectively reasonable"), superseded by statute on other grounds by Lewis v. State, Dept. of Licensing, 125 Wn. App. 666, 679-80, 105 P.3d 1029 (2005) (citing RCW 9.73.090(1)(a)). Further, the language of paragraph (3) was taken directly from Wanrow, which held that the jury must consider the "facts and circumstances known to the defendant, including those known substantially before the killing." Wanrow, 88 Wn.2d at 239.

Sanchez fails to show his trial attorney's performance was deficient for three key reasons. First, the standard WPIC 16.02 instruction is an accurate statement of law. Following the amendment to WPIC 16.02, our Supreme Court observed that they have, on many occasions, "upheld WPIC 16.02 against other attacks on its statement of the law of self-defense." State v. LeFaber, 128 Wn.2d 896, 901, 913 P.2d 369 (1996), abrogated on other grounds by State v. O'Hara, 167 Wn.2d 91, 101-04, 217 P.3d 756 (2009).

In response, Sanchez relies heavily on Allery. In particular, he claims that, as in that case, "[t]he jury should have been instructed to consider the self-defense issue from the defendant's perspective in light of all that she knew and *had*

*experienced* with the victim." Allery, 101 Wn.2d at 595 (emphasis added). From this, Sanchez argues Allery requires a court to instruct jurors to consider the defendant's "*experiences of trauma*" and not just their "knowledge of facts and circumstances" surrounding their use of force. (Emphasis added). As such, he argues that his counsel was ineffective in proposing an instruction which did not specifically require the jury to consider Sanchez's past trauma and multiple mental health disorders when assessing his justifiable homicide defense.

We disagree because the distinction between "facts and circumstances" known to a defendant, on the one hand, and what a defendant "had experienced," on the other, is a distinction without difference. In other words, the concept of "facts and circumstances as they appeared to the slayer" in WPIC 16.02 captures the same, or arguably even a broader, set of facts than what a defendant may have psychologically "experienced." At a minimum, the defendant's "experiences" are necessarily included within the "facts and circumstances" known to the defendant at the time. If there is a subtle distinction material to the analysis, Sanchez provides no authority in support of such a distinction. City of Seattle v. Levesque, 12 Wn. App. 2d 687, 697, 460 P.3d 205 (2020) ("'Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none.'") (quoting DeHeer v. Seattle Post-Intelligencer, 60 Wn.2d 122, 126, 372 P.2d 193 (1962)). Without authority supporting such a distinction, decisions approving WPIC 16.02 continue to be good law.

Second, Sanchez has failed to show how WPIC 16.02 prevented him from

effectively arguing his theory of the case. As stated in his brief, his "mental health disorders and its potential impact on him during the incident . . . were major subjects at his trial." In particular, Dr. Stanfill, Sanchez's medical expert, testified extensively to the effects of Sanchez's past trauma, substance abuse, and mental health issues. And Sanchez's counsel in closing argument tied those experiences of trauma (and his specific behavioral and mental health conditions) to his justifiable homicide defense. His counsel argued that Sanchez "reasonably believed he would have been raped, or seriously hurt, killed, if he did not use lethal force" as he feared he was "going to be rendered unconscious by either the GHB or the incredibly high amount of drugs that he was given." In short, Sanchez made his case.

Third, this court has held "an attorney's failure to raise novel legal theories or arguments is not ineffective assistance." State v. Brown, 159 Wn. App. 366, 371, 245 P.3d 776 (2011). In his reply brief, Sanchez proposes a new instruction that inserts language telling the jury to consider the defendant's actions "in light of [his] or [her] personal experiences" alongside the standard language of considering the "facts and circumstances as they appeared to [him] [her][.]" There may be psychological subtleties in how Sanchez's subjective mental health challenges affected his actions. However, his attorney's performance was not rendered deficient merely because they proposed a standard instruction over a novel one.

Finally, Sanchez also relies heavily on State v. Thomas. Specifically, Sanchez argues the case held "counsel was ineffective for failing to offer instruction regarding defendant's mental state where intent was a critical trial

issue." However, Thomas was interpreting RCW 46.61.024, Washington's felony flight statute. State v. Thomas, 109 Wn.2d 222, 227-28, 743 P.2d 816 (1987). There, the instruction had *entirely* failed to indicate there was a subjective component to section .024. Id. at 228. Thomas did not create a broad requirement or principle for jury instructions when a defendant's mental health is at issue. Further, Thomas did not consider, even indirectly, the propriety of the instructions in WPIC 16.02 or justifiable homicide more generally.

In short, it was not deficient performance for Sanchez's counsel to propose the legally correct justifiable homicide instruction, which allowed him to argue his theory of the case. Thus, this claimed error fails.[2]

B.      First Aggressor Instruction

In response to Sanchez's self-defense claim, the State sought and the court gave a first aggressor instruction, which followed the standard language of WPIC 16.04.[3]   11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS:

---

[2] Additionally, Sanchez does not establish prejudice as he does not show that there was a reasonable probability that, even had the instruction been deficient, an alternate instruction would have changed the verdict. First, while the given instruction did not reference Sanchez's specific history, it still instructed the jury to subjectively consider the "facts and circumstances as they appeared to [the defendant.]" It is unclear how an alternate instruction would have permitted consideration not already permitted concerning details about his past trauma in the apartment, and so would have changed the outcome. Second, the given instruction still required that the force used was "as a reasonably prudent person would use under the same or similar conditions as they reasonably appeared to the slayer." Even if some force may have been reasonable, when viewed through Sanchez' history of trauma, it was entirely within the jury's purview to find the level of force Sanchez used was unreasonable.

[3] The instruction read:

> No person may, by any intentional act reasonably likely to provoke a belligerent response, create a necessity for acting in self-defense and thereupon kill another person. Therefore, if you find beyond a reasonable

CRIMINAL 16.04 (5th ed. 2021) ("WPIC"). Sanchez now argues the instruction was improper because it was "neither supported by the evidence that Sanchez *maliciously* refused to leave the apartment, nor that Sippach's use of force against Sanchez was in response to his refusal to leave." (Emphasis added).

Whether there is sufficient evidence for a first aggressor instruction is reviewed de novo. State v. Bea, 162 Wn. App. 570, 577, 254 P.3d 948 (2011). The requesting party need only produce some evidence that the accused was the aggressor. Id. The evidence is viewed in the light most favorable to the requesting party. Id. A first aggressor instruction is still warranted even "if there is conflicting evidence as to whether the defendant's conduct precipitated a fight." State v. Wingate, 155 Wn.2d 817, 822, 122 P.3d 908 (2005).

Our Supreme Court also has stated that courts should "'use care'" in giving a first aggressor instruction due to its impact on claims of self-defense. State v. Grott, 195 Wn.2d 256, 266, 458 P.3d 750 (2020) (quoting State v. Riley, 137 Wn.2d 904, 910 n.2, 976 P.2d 624 (1999)). Despite this, first aggressor instructions should still be given where called for by the evidence. Id.

Sanchez cites to Bea, claiming the court imposed a "requirement that the trespass be malicious." Bea, however, only references the concept of malice once, and that reference was in the context of holding that using "force to expel a malicious trespasser" is an *example* of when a first aggressor instruction is

---

doubt that the defendant was the aggressor, and that defendant's acts and conduct provoked or commenced the fight, then self-defense is not available as a defense. Words alone are not adequate provocation for the defendant to be the aggressor.

justified. Bea, 162 Wn. App. at 578. Bea did not take the additional step of requiring that the trespass be malicious to justify a first aggressor instruction. Instead, Bea reiterated the long-standing principle that the State need only show (1) the provoking act was "'intentional'" and (2) a jury could reasonably find the act "'would provoke a belligerent response by the victim.'" Id. at 577 (quoting State v. Wasson, 54 Wn. App. 156, 159, 772 P.2d 1039 (1989)).

Viewing the evidence in a light most favorable to the requesting party, the State, we hold that Sanchez committed two intentional acts which a jury could reasonably find would provoke a belligerent response.

First, Sanchez testified that, after he poured out the GHB and was told to leave the victim's apartment, he "plead[ed]" to stay. A reasonable jury could find that his subsequent refusal to leave the apartment would have provoked a belligerent response. This inference is especially so considering that individuals in the apartment had consumed drugs, had a history of assaulting each other, and were thus likely compromised.

Second, Sanchez's testified that he was asked to leave precisely because he intentionally disposed of (what he thought was) GHB. Indeed, Humphrey reacted angrily to the destruction of his property and "started screaming to [Sippach] to get [Sanchez] . . . out of here, because [Sanchez] had taken something." From Sanchez's testimony, a reasonable jury could find that the destruction of the victim's property would provoke a belligerent response. Even if Sanchez thought he was disposing of the GHB for his own safety, and not "maliciously," the question is whether the destruction of another's property could

10

be viewed as provocative of a belligerent response. A reasonable jury could find that it would be.

Finally, Sanchez also argues "[t]he improper instruction effectively removed [his] self-defense claim from the jury's consideration and relieved the State of its burden to prove beyond a reasonable doubt that Sanchez did not act in self-defense." However, as our Supreme Court has clearly stated, "first aggressor instructions do not actually relieve the State of its burden of proof[.]" Grott, 195 Wn.2d at 268-69. The instruction is merely "used to explain to the jury one way in which the State may meet its burden" of disproving a claim of self-defense beyond a reasonable doubt. Id. at 268.

In short, the court did not err in giving the instruction as there was some evidence of two intentional acts that a jury could reasonably find would have provoked a belligerent response.

C.     Lesser Included Manslaughter in the Second Degree

The State charged Sanchez with two counts of murder in the second degree. Sanchez asked for, but the court declined to give, a lesser included instruction for manslaughter in the second degree. Now he argues "[t]he jury could have found that Sanchez was in imminent danger but was negligent in using more force than was necessary via the machete because his mental health disorders and methamphetamine intoxication impacted his perception of the risk of harm." In other words, Sanchez asserts that evidence related to his mental disorders and intoxication *alone* creates a factual basis for his diminished mental state at the time

of the killings, which entitles him to a second degree manslaughter instruction.[4]

A defendant is entitled to an instruction on a lesser included offense after satisfying a two-part test. State v. Workman, 90 Wn.2d 443, 447, 584 P.2d 382 (1978), superseded by statute on other grounds by State v. Adlington-Kelly, 95 Wn.2d 917, 920-23, 631 P.2d 954 (1981). First, as to the legal prong, "each of the elements of the lesser offense must be a necessary element of the offense charged." Id. at 448-49.

Second, as to the factual prong, "evidence in the case must support an inference that the lesser crime was committed." Id. "The factual prong of Workman is satisfied only if based on *some evidence* admitted, the jury could reject the greater charge and return a guilty verdict on the lesser." State v. Coryell, 197 Wn.2d 397, 407, 483 P.3d 98 (2021) (emphasis added).[5]

The appellate standard of review for lesser included instructions depends on the basis of the trial court's decision. Id. at 405. If the decision was based on

---

[4] Manslaughter in the second degree requires the defendant's "criminal negligence . . . cause[d] the death of another person." RCW 9A.32.070(1). Criminal negligence occurs when one "*fails to be aware* of a substantial risk that a wrongful act may occur" and the "substantial risk constitutes a gross deviation from the standard of care that a reasonable person would exercise in the same situation." RCW 9A.08.010(1)(d) (emphasis added). The mens rea for negligence is distinguished from the mens rea for recklessness, which is required for manslaughter in the first degree. RCW 9A.32.060(1)(a); RCW 9A.08.010(c) (defining recklessness in part as when a defendant "*disregards* a substantial risk that a wrongful act may occur") (emphasis added).

[5] As the State argues, there is some authority holding that the factual prong requires "*substantial* evidence that affirmatively indicates that [ ] manslaughter was committed" to the exclusion of first or second degree murder." State v. Perez-Cervantes, 141 Wn.2d 468, 480, 6 P.3d 1160 (2000) (emphasis added). However, as exemplified by State v. Coryell, 197 Wn.2d 397, 407, 483 P.3d 98 (2021), more recent precedent firmly indicates that the correct standard is "some" evidence.

a factual determination, it is reviewed for abuse of discretion. Id. Conversely, if the decision was based on a legal conclusion, it is reviewed de novo. Id.

> Giving juries the option of a lesser included offense
>
> is crucial to the integrity of our criminal justice system because when defendants are charged with only one crime, juries must either convict them of that crime or let them go free. In some cases, that will create a risk that the jury will convict the defendant despite having reasonable doubts.

Id. at 418 (quoting State v. Henderson, 182 Wn.2d 734, 736, 344 P.3d 1207 (2015)).

Here, as to the legal prong of Workman, the State concedes that manslaughter in the second degree is a lesser included charge to murder in the second degree. We accept that concession and, as such, the debate is focused squarely on the factual prong of Workman, specifically, on whether there was some evidence that affirmatively supports the lesser crime of manslaughter in the second degree, which we review for an abuse of discretion. Coryell, 197 Wn.2d at 405. "An abuse of discretion is found if the trial court relies on unsupported facts, takes a view that no reasonable person would take, applies the wrong legal standard, or bases its ruling on an erroneous view of the law." Gildon v. Simon Prop. Grp., Inc., 158 Wn.2d 483, 494, 145 P.3d 1196 (2006).

The trial court denied the instruction primarily because there was no evidence or testimony, be it from Sanchez's medical expert or elsewhere, that Sanchez lacked the capacity to formulate an intent to kill.[6]

---

[6] The court also noted that it was a novel basis in Washington to argue for criminal negligence on the basis of the defendant's consumption of meth.

Specifically as to a claim of self-defense, our Supreme Court has held that, as a general matter, "a defendant who reasonably believes he is in imminent danger and needs to act in self-defense, 'but recklessly or negligently used *more force than was necessary* to repel the attack,' is entitled to an instruction on manslaughter." State v. Schaffer 135 Wn.2d 355, 358, 957 P.2d 214 (1998) (emphasis added) (quoting State v. Jones, 95 Wn.2d 616, 623, 628 P.2d 472 (1981)).

Importantly, Schaffer, however, did not distinguish between manslaughter in the first and second degree. State v. Fluker, 5 Wn. App. 2d 374, 400, 425 P.3d 903 (2018). It is an important distinction because, to be entitled to a lesser included instruction for *second degree* manslaughter, this court has held that there must be evidence that the defendant was "*unaware of a substantial risk of death*." Id. at 399-400 (emphasis added). This court so held because the wrongful act prohibited by the manslaughter in the second degree statute is death caused by criminal negligence. Id. (citing RCW 9A.32.070(1)). And, again, the mens rea for criminal negligence is when one "fails to be aware of a substantial risk that a wrongful act may occur[.]" RCW 9A.08.010(1)(d).

Sanchez sought only a lesser included instruction for manslaughter in the second degree, not in the first degree. And, as his appellate counsel twice confirmed at oral argument, the only evidence Sanchez offers to support the claim that he was "unaware" of the risk of causing death while using the machete was Sanchez's allegedly "delusional state." State v. Sanchez, No. 83686-2-I (Nov. 8, 2023) at 1 min., 50 sec., through 2 min., 15 sec., & 4 min. 45 sec. through 5 min.,

14

25. sec., video recorded by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2023111136/?eventID=2023111136. In other words, Sanchez asks us to hold that evidence of delusions *alone* creates the factual basis for a lack of knowledge, here, of what effect the machetes would have on the two decedents.

The first and correct inquiry, however, is whether the evidence Sanchez presented could show he was actually "unaware of a substantial risk of death" at the time of the killings. Fluker, 5 Wn. App. 2d at 399-400 ("the evidence does not support finding Mar'Que was unaware of a substantial risk of death"); Coryell, 197 Wn.2d at 407 ("[t]he factual prong of Workman is satisfied only if based on some evidence admitted, the jury could reject the greater charge and return a guilty verdict on the lesser").

With that inquiry in mind, we conclude that Sanchez failed to provide any non-speculative evidence as to his actual state of mind at the time of the killings for two reasons. First, neither Sanchez, nor Dr. Stanfill, testified to Sanchez's actual ability, crucially at the time of the killings, to appreciate or not the substantial risk of death caused by his actions. Second, as Sanchez fled the scene and the bodies were not discovered for weeks, no other evidence is available to support that theory.

Dr. Stanfill interviewed Sanchez in September 2018, well after the murders occurred in January 2016. Dr. Stanfill also reviewed Sanchez's extensive medical record, dating back to 2007. As stated by Dr. Stanfill, "we don't have anything from right then" on the day of the murders. But he stated, "[w]e do have the June 2017

interview, interrogation with law enforcement. So part of what I'm doing is also comparing what is he telling me now versus what did he tell the detectives then."

Ultimately, Dr. Stanfill stated his conclusion was that

> [o]n January 10th to January 11th, 2016, Mr. Sanchez was experiencing intense persecutory and delusional beliefs associated with his substance use and PTSD and underlying psychotic condition. He *could* have believed at the time that he was in danger and that Mr. Sippach and Humphrey were conspiring against him. And *if he had that belief*, he *could* have perceived the event as dangerous, and that he needed to attack them to prevent his own harm or serious injury.

(emphasis added). In other words, Dr. Stanfill testified that Sanchez was suffering from certain mental health conditions (PTSD/psychosis) and did ingest substances, and in turn did have certain beliefs. But, as indicated in his substantially qualified language, he otherwise does not testify that Sanchez (a) in fact believed he was in danger, (b) in fact viewed the situation as dangerous, or that (c) he thus needed to protect himself. Dr. Stanfill merely testified to various possibilities that "could have" resulted from Sanchez's mental state and substance use on the night of the murders, "if" we make certain assumptions.

Moreover, at no time did Dr. Stanfill testify that Sanchez could not form an intent to kill, or, most importantly, that Sanchez otherwise failed to appreciate the risk of death from his actions, i.e., using a machete to mitigate the "threats."

For his part, Sanchez's testimony also fails to provide evidence of criminal negligence. He testified that he "attempted to injure [Sippach] so that [he] could get out" and "as for [Humphrey] . . . I can't give an explanation as to why I – I hit him and everything. And I -- I vaguely, barely remember even doing it, but my intention was to injure so that I could get away." Like Dr. Stanfill, Sanchez did not

16

claim he had a delusional event at the moment of the killings, or testify one way or another about his inability to form an intent to kill or, most importantly, his inability to appreciate what chopping someone's head scores of times could do to a person.

Sanchez's assertion that he only intended to injure his victims is similar to the claim in State v. Burley, where the defendant claimed that he only intended to "scare," but not kill, his victim. State v. Burley, 23 Wn. App. 881, 885-86, 598 P.2d 428 (1979). Like in Burley, Sanchez's testimony "tends to establish affirmatively that defendant was capable of forming the requisite mental state and to *disprove* the lesser-included offense" of manslaughter in the second degree. Id. at 886 (emphasis added). In other words, Sanchez's testimony either supports the conclusion that (1) he only meant to injure the two victims and thus "disproves" the requisite mental state for his desired instruction, or (2) he simply did not remember what he intended or what he knew about the effect of the machetes on the decedents, which provides no evidence entitling him to his desired instruction.

Finally, shortly before oral argument, Sanchez filed a statement of additional authorities, citing to this court's recent unpublished decision in State v. Rodriguez, No. 84205-6-I, slip op. at 13 (Wash. Ct. App. Oct. 23, 2023) (unpublished) https://www.courts.wa.gov/opinions/pdf/842056.pdf, for the proposition that, to obtain a lesser included instruction, he need only show that a jury could have concluded that "Sanchez's psychotic delusional state prevented him from knowing of and disregarding a substantial risk that a wrongful act may occur." In that case, Rodriguez stabbed his victim 70 times, but claimed he was in a psychotic delusional state at the time and asked the court to instruct the jury on manslaughter

in the second degree. Rodriguez, No. 84205-6-I slip op. at 1, 14-15. This court held that, because of his delusional state, in that case specifically supported by expert testimony, a reasonable jury could have found "that he did not know of and disregarded a substantial risk that a wrongful act may occur, but that he did act criminally negligent" and, thus, he was entitled to that instruction. Id. at 1, 8.

Rodriguez is factually distinguishable. In Rodriguez, there was ample evidence as to Rodriguez's mental state on the day of the murder. Specifically, Rodriguez "exhibited delusional thinking while with his roommates, police, and at the hospital" on the day of the murder. Id. at 13. Rodriguez's medical expert was also able to consider "a psychological evaluation conducted by another psychologist, police reports, body camera footage, and a toxicology report from the night of Rodriguez'[s] arrest." Id. at 7. Based on this, ultimately, Rodriguez's expert testified that "Rodriguez *was* suffering from delusions the night Garcia Martinez was killed." Id. at 8 (emphasis added).

In contrast, because Sanchez successfully fled the scene, the only evidence as to his mental state on the day of the murders was the testimony of Sanchez himself, who never testified he was unaware what a machete would do to the deceased, and of Dr. Stanfill, who acknowledged that "we don't have anything from" the day of the killings.[7] Unlike in Rodriguez, the only other witnesses to

---

[7] At oral argument, Sanchez's appellate counsel stated that while the expert medical testimony "from Rodriguez is going to the issue of a specific diminished capacity and *the ability to form intent, you're right, that is missing from this case*." State v. Sanchez, No. 83686-2-I (Nov. 8, 2023) at 3 min., 25 sec., through 4 min., 10 sec., video recorded by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2023111136/?eventID=2023111136 (emphasis added).

Sanchez's mental state at time the killings were the deceased. Unlike in Rodriguez, there was no "other admitted evidence" which could have "created an inference" of Sanchez's unawareness of the effects of his actions at the critical moment. Id. 1.

In sum, Sanchez failed to offer evidence that he was unaware of the risk that his use of the machetes could cause death and thus failed to offer evidence of criminal negligence. As such, the trial court did not err in denying an instruction on manslaughter in the second degree.

D.    Improper Opinion Testimony

Sanchez argues that a police detective's testimony amounted to a manifest constitutional error as it was "designed to invade the province of the jury" by suggesting "the jury should believe Sanchez's police interrogation statements over any others, including those which supported his self-defense claim."

At trial, Detective Thomas Mooney gave the below testimony.

PROSECUTOR:  Okay. Now, at the time that you and Detective Kasner traveled to Greenville, South Carolina, did you consider Mr. Sanchez to be a suspect or a person of interest, or how would you characterize your interest in him at that point?

MOONEY:  The only information we had was DNA evidence, and it didn't speak to -- you know, qualify him as, you know, a suspect.  I would say that person – he's a person of interest that we wanted to talk to because there was evidence that he was associated with – directly with both victims.

PROSECUTOR:  Okay. And if it did turn out that he was involved in the homicides, did you want to try to get a confession from him?

MOONEY:  I was certainly interested in getting -- you know, we're

19

*truth-seekers,* and if that was possible, yes.

(emphasis added).  Later, Sanchez elicited the following:

> DEFENSE COUNSEL:  You testified today that you didn't consider him a suspect at the time you were going down to Greenville; correct?
>
> MOONEY:  No, at that point he would be a person of interest.
>
> DEFENSE COUNSEL:  Okay. But you went down to Greenville to try to elicit a confession from him?
>
> MOONEY:  That's what I do in my business, and *that is the truth.*

(emphasis added).  Finally, the prosecution elicited the following:

> PROSECUTOR:  And [defense counsel] also asked you some questions about the fact that you tried to appeal to religion as a means to get him to talk to you about your investigation.  Do you recall that?
>
> MOONEY:  Yes.
>
> PROSECUTOR:  Do you consider it to be a bad thing when someone talks to you and ultimately tells you that they're the one that did it?
>
> MOONEY:  No.
>
> PROSECUTOR:  Is that kind of the point of the whole investigation, to figure out who did it?
>
> MOONEY:  Yeah. We're *truth-seekers*.  That's what we do, you know.

(emphasis added).

Sanchez's trial counsel did not object to any of the above testimony. Mooney's testimony was within the broader context of discussing his trip to Greenville, South Carolina to question Sanchez.

An error not objected to at trial can be raised for the first time on appeal if, among other reasons, it involved a "manifest error affecting a constitutional right."

20

RAP 2.5(a)(3). Among these rights, "[t]he right to have factual questions decided by the jury is crucial to the right to trial by jury." State v. Montgomery, 163 Wn.2d 577, 590, 183 P.3d 267 (2008). "Impermissible opinion testimony regarding the defendant's guilt may be reversible error because such evidence violates the defendant's constitutional right to a jury trial[.]" State v. Kirkman, 159 Wn.2d 918, 927, 155 P.3d 125 (2007). However, "opinion testimony relating only indirectly to a victim's credibility, if not objected to at trial, does not give rise to a manifest constitutional error." Id. at 922 (internal quotation marks omitted).

In Kirkman, a detective was testifying about the competency protocol in place when interviewing a child victim. Id. at 930. And the detective stated that, as part of protocol, he confirmed the child witness was able to distinguish between truth and a lie and promised to tell the truth. Id. The court held the testimony was not constitutionally improper as it "provided the necessary context that enabled the jury to assess the reasonableness of the . . . responses" and did not create a "special aura of reliability[.]" Id. at 931 (internal quotation marks omitted).

Mooney's testimony had a less direct relation to the defendant's credibility than what was seen in Kirkman. Here, the substance or credibility of Sanchez's statements was not directly discussed or even implicated by Mooney's testimony. Instead, Mooney's testimony was part of a broader conversation of the motivations and methods of Mooney's investigation.

Specifically, the first two instances of challenged testimony were part of a discussion on whether Sanchez was a person of interest or suspect prior to the South Carolina trip. In other words, the testimony was on why Mooney was

21

traveling to South Carolina, not the credibility of Sanchez's resulting statements.

The final portion of challenged testimony was part of a discussion on methods Mooney used during the interrogation, specifically Mooney's "appeal to religion." Similarly then, at most, Mooney's "truth-seeker" testimony had an indirect relation to the truth value of Sanchez's own statements. Accordingly, Mooney's testimony does not rise to a constitutional error under Kirkman.[8]

E.      Victim Penalty Assessment and DNA Collection Fee

Sanchez's judgment and sentence imposed both a victim penalty assessment ("VPA") and DNA collection fee. However, the trial court also had found Sanchez was indigent under 10.01.160(3).

Formerly, RCW 7.68.035(1)(a) mandated a $500 VPA for all adults found guilty in superior court of a crime. State v. Mathers, 193 Wn. App. 913, 918, 376 P.3d 1163. In 2023, our legislature amended section .035 to state that "[t]he court shall not impose the penalty assessment under this section if the court finds that the defendant, at the time of sentencing, is indigent as defined in RCW 10.01.160(3)." LAWS OF 2023, ch. 449, § 1; RCW 7.68.035(4). Further, courts are required to waive VPAs imposed prior to the 2023 amendments, on the offender's

---

[8] Sanchez also argues that the prosecutor committed misconduct by eliciting this testimony at all, and Sanchez's counsel provided ineffective assistance by not objecting. Because we hold this testimony was not constitutionally improper, we need not consider these assignments of error further.

Finally, Sanchez also briefly alludes to the cumulative error doctrine, which "applies when several errors occurred during trial that would not merit reversal standing alone, but together effectively denied the defendant a fair trial." In re Detention of McGray, 175 Wn. App. 328, 343, 306 P.3d 1005 (2013). This doctrine is inapplicable where, as here, there is no error within Sanchez's trial-related claims.

motion. Id.; RCW 7.68.035(5)(b).

Similarly, our legislature also amended statutes governing DNA collection fees, eliminating the fee for all defendants. LAWS OF 2023, ch. 449, § 4. Further, courts are required to waive any DNA collection fee imposed prior to the 2023 amendments, on the offender's motion. Id.; RCW 43.43.7541(2).

On appeal, the State conceded that the case must be remanded to strike both fees. Treating Sanchez's appeal as a motion to strike both fees, we remand this case to the trial court to strike the DNA collection fee and VPA in accordance with RCW 7.68.035(4) and RCW 43.43.7541(2).

F.    Statement of Additional Grounds

RAP 10.10 permits a criminal appellant to file a statement of additional grounds ("SAG"). A SAG serves to ensure that an appellant can raise issues in their criminal appeal that may have been overlooked by their attorney. Recognizing the practical limitations many incarcerated individuals face when preparing their own legal documents, RAP 10.10(c) does not require that the statement be supported by reference to the record or citation to authorities. But it does require that the appellant adequately "inform the court of the nature and occurrence of alleged errors." RAP 10.10(c). It also relieves the court of any independent obligation to search the record in support of the appellant's claims, making it prudent for the appellant to support their argument through reference to facts. RAP 10.10(c). To enable that factual support, it provides the means for appellants to obtain copies of the record from counsel. RAP 10.10(e).

1.  <u>Court Discretion on Trial Scheduling</u>

Sanchez alleged that the court set "a permanent deliberation date with no flexibility which compromised the complexity of this trial." Further, "[w]ith only 23 days for trial – The schedule was very tight . . . [t]his constant tension and hurriedness put an unjust hurriedness into Judge Widlan's decisions" such as whether or not to give particular jury instructions. Appellate courts "review a trial judge's courtroom management decisions for abuse of discretion." <u>Pierce v. Bill & Melinda Gates Found.</u>, 15 Wn. App. 2d 419, 444, 475 P.3d 1011 (2020) (internal quotation marks omitted).

There is ample precedent that "[t]rial judges have wide discretion to manage their courtrooms and conduct trials fairly, expeditiously, and impartially[.]" <u>Id.</u> This deference is due "[b]ecause the trial court is generally in the best position to perceive and structure its own proceedings[.]" <u>State v. Bejar</u>, 18 Wn. App. 2d 454, 461-62, 491 P.3d 229 (2021). Sanchez's generalized and speculative assertions do not overcome this deference nor establish an abuse of discretion.

2.  <u>Allegations of Police Misconduct at Crime Scene</u>

Sanchez appears to generally assert that the Seattle police mishandled evidence at the crime scene. In particular, he cites to trial testimony of Garry Jackson, a former crime scene investigator. Specifically, Sanchez asserts that "Jackson testif[ied] that Det. O'Keefe moved evidence for photos – [which] means the[re is] a 100% chance of tampering with evidence to setup the scene to their narrative of [r]obbery/[r]ansacking."

First, Sanchez's claim mischaracterizes the testimony. Jackson's actual

testimony was that "[u]nless Detective O'Keefe found it necessary to move something, moving in the room for the canvas or the photos, at this point nothing's been moved." In other words, he testified that the photos showed the room in its untouched state, with the caveat that something may have been moved if "necessary."

Moreover, even setting aside the otherwise highly speculative nature of this claim, "this court defers to the trier of fact for resolution of conflicting testimony, evaluation of the evidence's persuasiveness, and assessment of the witnesses' credibility." In re G.W.-F, 170 Wn. App. 631, 637, 285 P.3d 208 (2012). As we were not there to observe Jackson's testimony, we must defer to the trier of fact on its credibility and weight. State v. Olinger, 130 Wn. App. 22, 24, 121 P.3d 724 (2005) ("The fact finder . . . is in the best position to evaluate conflicting evidence, witness credibility, and the weight to be assigned to the evidence"). The trier of fact, here the jury, could have concluded that there was no tampering with the evidence. We will not disturb that finding.

### 3. Brady Violation

Finally, Sanchez argued that "[h]ad my Defense Counsel used [Brady v. Maryland] to obtain these evidences – [t]heir results – contents, etc. would have made a bigger impact on the final deliberation." He lists various physical items that should have been sought in discovery. The aim of Brady was to prevent "suppression by the prosecution of evidence favorable to an accused upon request[.]" Brady v. Maryland, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). However, other than Sanchez's speculative assertions, we do not have

any basis to believe any of those items were exculpatory.  As such, this claim fails.

### III.    CONCLUSION

We remand for the trial court to strike the VPA and DNA collection fee. Otherwise, we affirm.

Díaz, J.

WE CONCUR:

Birk, J.

Brunner, J.